# EXHIBIT 2

## Rule 26 Report of Gary Greenfield

I have been retained as an expert witness by counsel to Sempra Energy ("Sempra" or "plaintiff") in *Sempra v. Associated Electric & Gas Insurance Services Limited*, C.D. Cal., No. 2:23-cv-10544-JLS-SSC (the "action" or "coverage action"). I am providing this Report pursuant to Rule 26 of the Federal Rules of Civil Procedure.

I have been retained to provide my analysis and opinions regarding the reasonableness of the fees and expenses incurred and paid by Sempra for various parties to whom it holds indemnity obligations in the underlying actions described in more detail below. A summary of my analysis is set forth on Exhibit 1 hereto.

### My Background and Experience

I am the founder of Litigation Cost Management (LCM), based in Oakland, California. LCM commenced business in 1991. LCM is in the business of consulting regarding legal fee-related issues. As part of our business, we regularly conduct analyses of both legal and expert witness fees in litigation with regard to the reasonableness, appropriateness and allocation of time, fees and expenses being sought, as well as hourly rates. We also consult with clients regarding how to manage their outside litigation more effectively and efficiently. LCM works with both law firms and clients of law firms in undertaking its analyses and consulting about effective litigation management.

Prior to starting LCM in January 1991, I was a partner in the law firm of Shartsis, Friese & Ginsburg in San Francisco, California, where I was a litigator for fifteen years, having become a partner in the firm in 1981. During my career at my former law firm, I handled general commercial litigation, from pre-filing preparation and negotiations through trials and appeals. I handled litigation of varying types, including breach of contract, constitutional law, securities, fraud, bankruptcy litigation, intellectual property, unfair competition, and civil rights litigation. I represented both plaintiffs and defendants. I handled both contingency cases and cases where we were compensated on an hourly basis. I graduated from the University of California, Berkeley School of Law, in 1975 and received my undergraduate degree from Stanford University in 1971. Attached hereto as Exhibit 2 is my Curriculum Vitae.

Since LCM was founded, I have conducted hundreds of analyses of the legal and expert witness fees and expenses in cases of various types and sizes. These have included individual actions, multi-party suits and class actions. The cases have included the full range of civil litigation, including antitrust, breach of contract, civil rights, constitutional law, mass torts, copyright, disability, discrimination, environmental, ERISA, bankruptcy, False Claims Act, insurance coverage and bad faith, inverse condemnation, patent, personal injury, products liability, Public Records Act, real property, securities, tax, and trademark cases. I have personally been involved in conducting and supervising each of these analyses. As part of my work on these projects, I have prepared and submitted numerous reports on attorneys' fees issues on behalf of law firms or clients seeking to recover their fees and on behalf of parties opposing requests for fees.

I have qualified and testified previously as an expert witness in litigation and arbitration regarding legal and expert witness fees on a number of occasions both on behalf of parties seeking to recover their attorneys' fees and on behalf of parties opposing requests for attorneys' fees. I have provided oral testimony in arbitrations or litigation in approximately thirty cases. I have provided written reports or testimony in the form of declarations under oath, reports under Rule 26 of the Federal Rules of Civil Procedure, or reports in arbitrations on hundreds of occasions.

I was appointed a Special Master to analyze and report to the Superior Court of California for the County of San Francisco regarding the fees and expenses of various law firms and experts in an insurance company conservation proceeding before that Court.

I am currently engaged by the policyholder and insurers in several cases to do an independent analysis of the policyholder's legal fees to be paid by the insurers in an ongoing basis in the cases.

As part of my work, I consult with law firms and clients of law firms regarding law firm billing practices, effective litigation management, and legal bill analysis and auditing procedures. I have lectured and conducted seminars for clients and law firms in each of these areas.

For purposes of my analyses in these various cases and my consulting work, we have received, and I have analyzed, the time entries, billing rates and expenses billed in hundreds of cases, involving law firms and law firm offices across the United States. I also receive and review bills and rate information in cases beyond those I work on as an expert in litigation. As a result, I have reviewed the billing practices and billing rates of hundreds of firms and thousands of lawyers and non-lawyers providing services across the country. LCM maintains a database of the rate information received. I also have reviewed databases of rates and surveys of billing rates published by legal periodicals and assembled by other legal consultants, including the Valeo Partners database, the Thomson Reuters Legal Billing Report, the Wolters Kluwer Real Rate Report, the ALM Survey of Law Firm Economics, the National Law Journal Billing Report and others. I also regularly review cases and articles dealing with attorneys' fees, litigation management issues, and billing rates being charged in the legal industry. As a result, I am familiar with typical and commonly accepted billing practices among law firms, as well as the rates typically charged by lawyers of various experience levels and expertise both nationally and in various parts of the United States.

In addition, as a result of my experience, I am familiar with the common and normal processes used by courts and arbitrators in analyzing requests for fees in numerous contexts, having been involved in hundreds of requests for fees, as well as trials and arbitrations where fees were at issue.

Prior Testimony and Compensation

My testimony in depositions, trials or arbitrations in the last four years is set forth on Exhibit 3 hereto.

I am being compensated at the rate of $700 per hour for my work in this action.

Materials Reviewed and Interviews

I have been provided, and reviewed as necessary for purposes of my analysis, the materials set forth on Exhibit 4 hereto, including law firm invoices and various other materials related to the billings in this matter; the Complaint, discovery and Initial Disclosures under Rule 26 filed in this action; the Complaints, demurrers, motions, requests for judicial notice, Orders and other materials filed in the underlying actions described below; the Sempra outside counsel billing guidelines; the correspondence between counsel for Sempra and defendant AEGIS regarding the law firm billings and materials related to the audits by AEGIS of certain of those billings.

I have also interviewed both inhouse counsel at Sempra and outside counsel who represented the defendants in the underlying actions described below.

Background of the Action

This is an insurance coverage action arising out of litigation following a gas leak that was discovered on October 23, 2015 at a gas well owned and operated by SoCalGas, a wholly-owned subsidiary of plaintiff Sempra.

As a result of the gas leak, and alleged historic issues at SoCalGas' Aliso Canyon natural gas storage facility, there were hundreds of civil lawsuits filed against Sempra and SoCalGas seeking damages of various types (the "tort litigation").  In addition, there were lawsuits filed by various public entities and a criminal proceeding.  Most of these lawsuits became part of the Coordination Proceeding Special Title (Rule 3.550), Southern California Gas Leak Cases, Judicial Council Coordination Proceeding No. 4861 (the "JCCP"), which was created to manage the various related legal proceedings. There were also regulatory proceedings involving state and local agencies, including the California Department of Conservation, Division of Oil, Gas, and Geothermal Resources ("DOGGR"), the California Public Utilities Commission ("CPUC"), the Los Angeles County Department of Public Health, the South Coast Air Quality Management District ("SCAQMD"), the California Air Resources Board, and the California Department of Industrial Relations, Division of Occupational Safety and Health ("Cal/OSHA").

Commencing in February, 2016, there were six shareholder derivative lawsuits (the "Derivative Actions") and a federal securities class action (the "Securities Action") (together, the "Underlying Actions") filed, some of which became part of the JCCP.  The Derivative Actions were filed against various officers and/or directors of Sempra or

SoCalGas at the time of the gas leak, with Sempra and SoCalGas (together, the "Companies") named as "nominal defendants." The Derivative Actions were:

- *Favors v. Reed et al.*, Los Angeles Superior Court, No. BC664302 ("*Favors*");

- *Fazio v. Reed et al.*, San Diego Superior Court, No. 37-2017-00007459-CU-SL-CTL ("*Fazio*");

- *Firemen's Retirement Systems v. Reed et al.*, San Diego Superior Court, No. 37-2016-00005842-CU-BT-CTL ("*Firemen's*");

- *Fischman v. Reed et al.*, United States District Court for the Southern District of California, No.16-CV-1006-WQH-NLS("*Fischman*");

- *Kanter v. Reed et al.*, Los Angeles Superior Court, No. BC611319 ("*Kanter*"); and

- *Shupak v. Reed et al.*, Los Angeles Superior Court, No. BC617444 ("*Shupak*").

The Securities Action, *Plumley v. Sempra*, et al., United States District Court for the Southern District of California, No. 3:16-cv-00512-BEN-RBB) ("*Plumley*"), was filed on February 29, 2016 and alleged federal securities law violations against Sempra, Debra Reed (Sempra's then-Chairman and Chief Executive Officer), and Joseph Householder (Sempra's then-Chief Financial Officer and Executive Vice President).[1]

The *Fischman* derivative action was filed in federal court in San Diego, and the other five derivate actions were filed in state court in Los Angeles or San Diego.  Ultimately, the state court derivative actions, other than *Fazio*, were consolidated into one action in the Los Angeles Superior Court (the "*Kanter* Consolidated Action").

Prior to filing suit, the plaintiff in *Fazio* made a demand on the Sempra Board of Directors to undertake an investigation of the conduct of certain then-current and/or former officers and directors of Sempra and to bring a lawsuit against those of the officers and directors who had breached their fiduciary duties to Sempra (the "Fazio Demand").  As a result of the Fazio Demand and the Derivative Actions, the Sempra Board formed a Demand Review Committee (the "DRC") to investigate the allegations in the Fazio Demand, any subsequent shareholder demands, and the Derivative Actions, and to advise the Board as to whether an action should be brought (or maintained) against the officers and directors who were alleged to have violated their duties. [2]

On February 3, 2016, the Sempra Board also formed a Special Matters Committee (the "SMC") to investigate the gas leak and the events leading up to the leak, make recommendations to the Board regarding the leak and its aftermath, review and analyze issues related to the leak, and oversee the management of and resolution of issues

---

[1] A Second Amended Complaint was filed in *Plumley* which dropped Mr. Householder as a defendant and added SoCalGas and Dennis Arriola as defendants.

[2] Subsequently, a demand for Board action was also made by another shareholder (Howard Stapleton), but no lawsuit was ultimately filed by Mr. Stapleton.

pertaining to the leak, including the litigation arising from the leak and the allegations of negligence at the facility.

As a result of the filing of the Underlying Actions, there was extensive motion practice and two appeals. Motions to dismiss were filed in the two federal court actions, and demurrers were filed in the five state court actions, along with other motions and requests for relief. Ultimately, all the cases were dismissed with prejudice, with the plaintiffs obtaining no relief.

Because of potentially divergent interests among the defendants in the Underlying Actions, the following law firms were retained to represent the various defendants in the actions and the DRC:

- Morgan Lewis & Bockius LLP ("Morgan Lewis") was retained to represent Sempra and SoCalGas;

- O'Melveny & Myers LLP (O'Melveny") was retained to represent the officers and employees of Sempra and SoCalGas who were named as defendants in the Underlying Actions;

- Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") was retained to represent (i) members of the Board of Directors of Sempra and SoCalGas who were named as defendants in the Underlying Actions and (ii) the SMC;

- Cooley LLP ("Cooley") was retained to represent Debra Reed, Sempra's then-Chair of the Board of Directors and Chief Executive Officer;

- Fenwick & West LLP ("Fenwick") and subsequently Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale") were retained to represent the DRC.[3]

Prior to the gas leak, Sempra obtained a Directors & Officers (D&O) insurance policy from defendant AEGIS (the "Policy") which obligates AEGIS to reimburse Sempra for amounts Sempra incurred by or on behalf of the directors and officers in the investigation or defense of covered claims made during the policy period.

On December 8, 2015, Sempra notified AEGIS of the gas leak. Thereafter, Sempra provided AEGIS with notice of each of the Underlying Actions as they were filed and demanded to be reimbursed by AEGIS under the terms of the Policy for all "Defense Costs" incurred in those Actions. AEGIS accepted its obligation to reimburse Sempra, subject to a reservation of rights.

Sempra has tendered the attorneys' fees and expenses incurred (with certain adjustments) in the Underlying Actions to AEGIS. AEGIS has paid a portion of the fees and expenses, but objected to others on various grounds. In this action, Sempra is seeking to recover the fees and expenses not paid by AEGIS, subject to the limits in the Policy. As

---

[3] Susan Muck, the attorney retained to oversee the investigation on behalf of the DRC, moved from Fenwick to WilmerHale during the course of the litigation.

stated above, I have been retained to provide my analysis, conclusions and opinions regarding the reasonableness of those fees and expenses.

Fees and Expenses Sought

There are $28,941,079.26 in unreimbursed fees and expenses, as set forth in Exhibit 1 hereto. This reflects the unreimbursed law firm fees and expenses, the unreimbursed fees and expenses of outside vendors paid directly by Sempra, post-billing adjustments made by Sempra, adjustments to reflect time related to coverage issues, amounts paid or recognized by AEGIS[4] and an additional five percent adjustment discussed below. Of the $28,941,079.26 in unreimbursed fees and expenses, Sempra seeks to recover the remaining limit of $27,480,599 under the AEGIS Policy.

Approach to Analysis

The question in assessing the reasonableness of fees and expenses in any particular matter is whether the overall time, fees and expenses billed are reasonable given all the relevant circumstances. There is no single amount that constitutes the "reasonable fee" in a case. The question is whether the fees are within the range of reasonableness for the case, given all the relevant circumstances.

There are many court decisions across the United States which address the issue of the reasonableness of fees in various contexts. In addition, the American Bar Association has Model Rules of Professional Conduct ("Model Rules"), and virtually every state has rules of professional conduct, that address the factors to be considered in assessing the reasonableness of fees. Rule 1.5 of the Model Rules sets out the following factors to be considered:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

---

[4] Where AEGIS paid the entire invoice, it is not included in the amounts sought (or the amounts paid or recognized by AEGIS).

(8) whether the fee is fixed or contingent.

California includes these factors, among others, in Rule 1.5 of the California Rules of Professional Conduct.[5] Not all of these factors are relevant in every case, and factors not listed may be relevant as well to an assessment of the reasonableness of fees.

In this case, in my opinion, the factors that are most relevant to the reasonableness of the fees and expenses incurred with respect to the Underlying Actions are:

- The amounts at risk for the defendants in the Underlying Actions;

- The success achieved;

- The complexity of the case and the work required;

- The experience, reputation, and expertise of the lawyers performing the services;

- The quality of opposing counsel;

- The management of the litigation; and

- The fact that the client was incurring and paying the fees and expenses during the litigation without certainty of reimbursement.

In reaching my opinions regarding the reasonableness of the fees and expenses incurred by Sempra, I considered each of these factors, as discussed below.

<u>The Amounts At Risk For The Defendants In The Underlying Actions</u>

The amounts the defendants have at risk in a case is obviously relevant to the reasonableness of the fees and expenses incurred.

Pursuant to the Master Agreement to Resolve JCCP No. 4861 Private Party Claims ("Master Agreement"), Sempra agreed to pay up to $1.8 billion to settle the claims of the individual plaintiffs in the tort litigation in the JCCP, which would presumably have been sought as damages by the derivative shareholder plaintiffs. In the Court of Appeal opinion in *Kanter* Consolidated Action, the Court noted that, in a filing with the Securities and Exchange Commission ("SEC"), Sempra indicated that it had, as of November 11, 2019 (which was prior to the settlement under the Master Agreement), suffered at least $1.1 billion in damages. Thus, the defendants in the Underlying Actions had potential exposure

---

[5] Rule 1.5 specifically addresses determining whether fees are "unconscionable," rather than the "reasonableness" of the fees, and the Rule includes factors which are more relevant to a determination of "unconscionability." However, the California courts have made clear that the factors set out in the text are relevant to an assessment of the "reasonableness" of fees as well.

of in excess of $2.9 billion—*i.e.,* the damage to the Companies as a result of the leak and claims of historic negligence at the facility—if those Actions moved forward.

Plainly, the amounts at risk for the defendants in the Underlying Actions justified the fees and expenses incurred in this action.

The Success Achieved

While a party is entitled to recover its fees and costs from its insurers , regardless of its success in the underlying litigation, the success achieved in a case is relevant to the reasonableness of the fees and expenses incurred because, among other reasons, it reflects upon the reasonableness of the approach of the party seeking the fees. Here, Sempra and the other defendants in the Underlying Actions were entirely successful in that all the actions were dismissed with prejudice with the plaintiffs obtaining no recoveries. The defendants thus were able to avoid having to pay potentially billions of dollars to settle the Underlying Actions or to respond to a judgment in addition to avoiding the cost of additional attorneys' fees and expenses.

The Complexity of the Case and the Work Required

Obviously, the amount of work that was required to investigate and defend the Underlying Actions is an important consideration in assessing the reasonableness of the fees and expenses incurred. There were seven lawsuits, brought by ten law firms, in both state and federal courts and in both San Diego and Los Angeles.[6] The complexities of the underlying facts relating to the gas leak and alleged negligent oversight alone made this a very complicated matter. The allegations of the Complaints in the Underlying Actions were extremely detailed and described events going back a number of years including allegations of failures by the directors or officers to implement safety protocols that were being considered.

As the description of the overall litigation above indicates, a major portion of the work was in the motion and appellate practice leading to dismissals of all seven of the Underlying Actions. However, there was also very substantial other work that the firms were required to undertake to be prepared to represent their respective clients if any of the actions moved beyond the pleading stage, as well as by counsel for the DRC to investigate the claims asserted in the Demands and the Derivative Actions.

Motion Practice and Appeals

The Derivative Actions

Under California law, before filing a shareholder derivative action against a corporation, a shareholder who contends that officers and/or directors of the corporation

---

[6] There was substantial time spent dealing with strategic issues such as the appropriate venue and forum to litigate the Underlying Actions.

have breached their fiduciary duties to the corporation is obligated to make a demand on the corporation to itself bring an action against the directors or officers who have allegedly breached their fiduciary duties, unless the shareholder can demonstrate that making such a demand would be futile.

<u><em>Kanter</em> Consolidated Action</u>

The *Kanter* Consolidated Action includes the first two shareholder derivative actions filed against the underlying defendants—the *Firemen's* lawsuit filed on February 11, 2016, and the *Kanter* lawsuit filed on February 23, 2016. These two cases, along with the *Favors* and *Shupak* lawsuits, which ultimately were consolidated into one action—the *Kanter* Consolidated Action—were "demand futility" cases, meaning that the underlying plaintiffs claimed that a demand on Sempra's Board to investigate and file suit against the defendant directors and officers would have been futile.

On May 25, 2016, the plaintiff in *Kanter* filed a petition to coordinate the initial three cases filed, which was granted (with *Favors* being added when it was filed on June 17, 2017). On August 8, 2016, the defendants filed a motion to stay the proceedings pending the decision in *Fischman*, described below, which was still under submission. That motion was granted on November 2, 2016. On January 12, 2017, the Court granted the petition to coordinate the cases with the JCCP.

On March 30, 2017, lead counsel in the coordinated Derivative Actions filed a motion for relief from the stay to allow the plaintiffs to participate in discovery that was taking place in the JCCP. The defendants opposed the motion which was denied. On December 18, 2019, plaintiffs filed a second motion for relief from the stay to allow plaintiffs to obtain certain discovery from the JCCP, obtain certain other documents, serve interrogatories and take depositions. The defendants also opposed that motion, and it was denied as well.

On August 10, 2017, the plaintiffs filed a Consolidated Plaintiffs' Derivative Complaint (the "Consolidated Complaint"). On September 15, 2017, the defendants filed demurrers to the Consolidated Complaint. On November 4, 2019, the Court granted the demurrers with leave to amend.

On February 5, 2020, the plaintiffs in the now-consolidated actions filed their First Amended Consolidated Derivative Complaint. On April 16, 2020, the defendants filed demurrers. On December 30, 2020, the Court granted the demurrers and indicated it would give the plaintiffs the opportunity at a subsequent hearing to convince the Court through materials filed in the JCCP that plaintiffs could successfully amend the Complaint. Ultimately, the plaintiffs chose not to amend the Complaint. Judgment of dismissal was entered on February 4, 2021, and the plaintiffs appealed. After full briefing and oral argument, on June 2, 2023, the California Court of Appeals upheld the dismissal.

*Fischman*

In *Fischman*, the federal shareholder derivative action, the Complaint was filed on April 25, 2016. *Fischman* was also a "demand futility" case where the plaintiff alleged that making a demand to Sempra to take action against the directors or officers of Sempra would have been futile. Sempra and SoCalGas filed a motion to dismiss on August 1, 2016. The defendant directors and officers filed motions to dismiss on separate grounds and joined in the Companies' motion.  On March 29, 2017, the Court granted the Companies' motion to dismiss without prejudice and denied the directors' and officers' motions as moot.  The Court did not grant plaintiff leave to amend, instead giving plaintiff thirty days to seek leave to amend.  In lieu of seeking leave to amend, plaintiff sought to voluntarily dismiss the complaint without prejudice, which the defendants opposed. Ultimately, on August 4, 2017, the Court granted plaintiff's motion to voluntarily dismiss the action without prejudice.[7]

*Fazio*

The *Fazio* lawsuit was the only Derivative Action filed against the underlying defendants where a demand was made by the plaintiff shareholder before filing suit. Fazio sent a shareholder demand letter to Sempra's Board on April 13, 2016—over two months after the *Kanter* lawsuit was filed. In June 2016, the DRC, which was investigating the allegations in the then-filed Derivative Actions and the Fazio Demand, determined that it was appropriate to defer consideration of Fazio's Demand until after, among other things, the completion of the independent Root Cause Analysis,[8] which was being conducted to investigate the cause of the gas leak.  Ultimately, *Fazio* filed his lawsuit on March 1, 2017, claiming that the DRC's decision to defer consideration of his demand was the equivalent of a refusal of the Fazio Demand.

On September 15, 2017, Sempra, which was sued as a nominal defendant, filed a demurrer to the *Fazio* Complaint. The defendant officers and directors filed demurrers on separate grounds and joined in Sempra's demurrer.  On November 4, 2019, the Court granted the demurrers with leave to amend.  In so doing, the Court found that the passage of time did not constitute a refusal of the Demand because the reasons for the DRC deferral of its decision were within the scope of the protections of the business judgment rule. [9]

---

[7] Counsel for Fischman was also counsel for the plaintiff in the *Favors* action which was filed after *Fischman* was dismissed.

[8] The Root Cause Analysis was an analysis by Blade Energy Partners (selected by the DOGGR and the CPUC but paid for by SoCalGas) to investigate the cause of the gas leak.

[9] The Court did not provide a specific deadline for plaintiff's amending the Complaint and also indicated plaintiff could instead file a new action.  Ultimately, the plaintiff filed an Amended Complaint on June 23, 2022, as discussed later in the text.

The DRC finished its investigation (described in more detail below) and reported its conclusions to Sempra's Board. On February 22, 2022, the Board adopted a Resolution stating that there was no basis for action against any of the defendant directors or officers for breach of their fiduciary duties and that such actions would not benefit Sempra and therefore should not be pursued.

On June 23, 2022, Fazio filed an Amended Complaint, essentially contending that the Board's refusal, based on the DRC's investigation, was improper and not made in good faith and that Fazio should be allowed to prosecute the derivative action on behalf of Sempra. Sempra filed a demurrer, asserting that Fazio had not provided sufficient specific facts to overcome the presumption that the Board had exercised appropriate business judgment. The director and officer defendants joined in Sempra's demurrer.  On November 30, 2022, the Court entered its Order granting the demurrers without leave to amend. The Court detailed the elements of the DRC's investigation as described below and found that Fazio had not made any affirmative allegations, let alone carried his burden of proof, that the DRC's investigation was not carried out in good faith or constituted an unreasonable failure to investigate any material facts. The case was dismissed with prejudice on December 22, 2022.  An appeal was filed by Fazio but later abandoned.

<u>The Securities Action</u>

In *Plumley*, the federal securities class action, the initial Complaint was filed on February 20, 2016, and, on July 26, 2016, an Amended Complaint was filed.  On September 12, 2016, defendants Sempra, Reed and Householder filed a motion to dismiss the Amended Complaint, in which defendant SoCalGas subsequently joined.  On June 20, 2017, the motion to dismiss was granted.  On July 11, 2017, plaintiffs filed a Second Amended Complaint.  On August 25, 2017, the defendants filed a motion to dismiss the Second Amended Complaint.  On March 26, 2018, the Court granted the motion to dismiss with prejudice.  Plaintiffs filed a motion for reconsideration, which the defendants opposed and which was denied.  Plaintiffs filed a Notice of Appeal on January 28, 2019.  On June 28, 2019, plaintiffs filed a second motion for reconsideration, which defendants opposed and was denied on September 18, 2019.  Plaintiffs filed a Notice of Appeal regarding the denial of their second motion for reconsideration on October 18, 2019.  On March 22, 2021, the Ninth Circuit denied both appeals and affirmed the dismissal with prejudice.

In sum, over the course of the seven cases, there were twelve demurrers, three motions to dismiss, and two motions for relief from the stay to undertake discovery, in addition to other requests for relief, and two appeals. [10]

---

[10] In addition, there were extensive Requests for Judicial Notice filed, both by the defendants' counsel and the plaintiffs' counsel.

<u>Review of Discovery and Materials in the Public Record</u>

Although there was no discovery undertaken in the Underlying Actions,[11] there was nevertheless very substantial work required in terms of reviewing documents and Electronically Stored Information ("ESI"), both that was in the public record and that had been produced in the JCCP, as well as review of other discovery taken in the JCCP. The Complaints in the Underlying Actions were lengthy, extremely detailed and heavily reliant on materials in the public record, such as filings with the SEC, prior testimony and filings with the CPUC, testimony in various proceedings, historic well files and other related files from the Aliso Canyon storage facility, press releases, and Sempra and SoCalGas corporate documents.  Counsel for the defendants in the Underlying Actions had to become familiar with these materials and conduct their own research in the public record for a variety of purposes. These included preparing the demurrers and motions to dismiss and other filings in the Underlying Actions, preparing for the possibility that one or more of the Underlying Actions would go beyond the pleading stage and thus into discovery, and preparing witnesses for interviews by the DRC in connection with its investigation of the allegations contained in the Demands and Derivative Actions, which investigation ultimately lead to the dismissal of the *Fazio* lawsuit as discussed above.

<u>Document/ESI Production and Analysis</u>

In connection with the investigation and defense of the various lawsuits filed after the 2015 leak, Sempra and SoCalGas collected millions of pages of documents related to, among other things, the leak, the Aliso Canyon facility, and the allegations contained in the various lawsuits in the JCCP, including the Derivative Actions and the Securities Action.  A portion of those documents, more than 1.7 million documents (consisting of 5 million pages) plus hundreds of Gigabytes of native files and data, ultimately were produced by Sempra and SoCalGas in the JCCP [12]

The documents and ESI were reviewed by counsel in the Underlying Actions for a variety of purposes, including preparing the demurrers and motions to dismiss, preparing the directors and officers for depositions in the JCCP and for interviews by the DRC in connection with the DRC's independent investigation of the allegations in the Demands and the Derivative Actions, which ultimately led to the dismissal of the *Fazio* lawsuit and was important for the defense of the *Kanter* Consolidated Action.  The DRC had complete access to the entire document database in connection with its investigation and reviewed and relied on those documents in connection with its investigation and report.

---

[11] Some of the shareholder plaintiffs made demands to inspect Sempra books and records to which Sempra responded.

[12] The fees and expenses related to the collection, review, analysis, and overall management of the documents and ESI were generally split 50-50 between the billings for the Derivative Actions and for the other civil litigation in the JCCP.

<u>Review of Interrogatory Responses</u>

Although no interrogatories were served by the parties in the Underlying Actions, it was necessary for counsel in those Actions to review draft responses in the JCCP, including those directed to certain of the directors who were named as defendants in the Toll Brothers, Inc. litigation that was part of the JCCP.

<u>Review of Depositions</u>

A number of the director and officer defendants in the Derivative Actions were deposed in other litigation in the JCCP and their depositions had to be reviewed (either in whole or part), both for their representation in the Underlying Actions and for the work of the DRC where a number of them were interviewed.

<u>Demand Review Committee (DRC)</u>

As noted above, the Sempra Board resolved to create the DRC in response to the *Firemen's, Fischman, Kanter,* and *Shupak* lawsuits and the Fazio Demand.  The DRC's mandate was to investigate the allegations made in the Derivate Actions and the Demands; consider any alleged misconduct by the directors or executive officers of Sempra or SoCalGas; and provide a recommendation to the Sempra Board regarding whether to maintain or seek to dismiss the Derivative Actions.  Susan Muck of Fenwick (and subsequently WilmerHale), a specialist in conducting corporate investigations of various types, as well as representing corporations in shareholder derivative litigation and securities class actions, was retained to represent the DRC and to oversee the DRC's investigation.  Ms. Muck and Fenwick were retained in June, 2017, three months after the inception of the *Fazio* lawsuit.

For the DRC to make a fully informed recommendation to the Board, it was necessary for Fenwick and subsequently WilmerHale to spend substantial time monitoring the Derivative and Securities Actions, as well as the other cases and proceedings in the JCCP, to thoroughly investigate whether there was a basis for a finding of a breach of fiduciary duty by any of the officers or directors of Sempra or SoCalGas.[13]

The investigation which Fenwick/WilmerHale undertook was extensive and had a number of facets.  As described in the Order Sustaining Demurrer in *Fazio*, counsel for the DRC and its members:

---

[13] For example, the DRC needed to understand what had happened over the course of the years both before and after the gas leak to assess whether the directors and/or officers had breached their fiduciary obligations (*e.g.*, by not providing appropriate oversight or not taking appropriate action at various times) because there were allegations in the Derivative Actions about historic conduct and the Board's alleged failures re oversight.

- Convened thirty-three (33) formal committee meetings;

- Reviewed and analyzed filings with the SEC;[14]

- Reviewed and analyzed corporate governance documents, including articles of incorporation, bylaws, and committee charters;

- Conducted a site inspection at Aliso Canyon, including the SS-25 wellsite and relief well location;

- Conducted interviews with twenty-four (24) witnesses, some of whom met with the Committee multiple times;

- Reviewed approximately 148,000 documents produced in the tort litigation in the JCCP;[15]

- Reviewed approximately 235 depositions in the JCCP and 7,500 deposition exhibits;[16]

- Analyzed the Blade Root Cause Analysis, including the supplemental volumes;

- Analyzed the Evolving Energy Consortium ("2EC") Independent Safety Culture Assessment of SoCalGas and Sempra Energy published in January 2022;

- Monitored the various related proceedings pending before the California Superior Court, County of Los Angeles; the California Court of Appeals; the Supreme Court of California; the United States District Court for the Southern District of California; the United States Court of Appeals for the Ninth Circuit; and the California Public Utilities Commission;[17] and

---

[14] SEC filings were cited and relied upon in the Derivative Actions. In addition, SEC filings often contain information important to an investigation of this type, such as the oversight exercised (or which should have been exercised) by officers and directors in various areas and information regarding compensation and potential interested party transactions.

[15] Counsel for the DRC obtained the entire database of documents and ESI produced in the JCCP and undertook an independent review of relevant materials in that database.

[16] Review of the depositions helped the DRC determine, among other things, who needed to be interviewed and whether the depositions of certain individuals sufficed in lieu of interviews. The depositions also provided significant substantive information to the DRC for their investigation, especially given plaintiffs' counsel's incentive to elicit useful testimony under oath from deponents.

[17] Because the damages alleged in the Derivative Actions were based, in part, on the JCCP actions, the DRC needed to monitor and keep abreast of the various proceedings in the JCCP, including the actions by private parties, the actions by various public entities and proceedings before various public agencies. Additionally, monitoring these actions allowed the DRC to determine if there were facts developed in those proceedings that were potentially relevant to the Derivative Actions, to identify whether there were sources of

- Conducted extensive legal and factual research and analysis of standards, cases, statutes of limitation, potential witnesses, and precedents applicable to the claims and potential claims alleged and individuals named in the Demands and derivative lawsuits.

Counsel also attended hearings in the Derivative Actions, reported to the Court in the *Fazio* action regarding the status of the DRC's investigation, including filing status reports with the Court, and reviewed materials to be filed by the defendants in the Derivative Actions to ensure that the filings accurately characterized the work of the DRC.

Ultimately, the DRC prepared a report summarizing the DRC's findings and both counsel and the DRC met with the Board to discuss the DRC's findings. As a result of that report and the Board's consideration of the nature and depth of the DRC's investigation, the Board determined not to pursue claims against any of the officers or directors, both because the DRC had concluded that there was no basis for such claims and because pursuing such claims would not be in the best interests of the Companies. This was obviously the critical determination in the dismissal of *Fazio*, but the DRC's analysis and work were also relevant in the "demand futility" cases as well. [18]

In summary, not only did the DRC's work ultimately lead to the dismissal of *Fazio,* the DRC's analysis and work were also relevant in the "demand futility" cases as well in that it demonstrated to the courts and shareholders' counsel in the Derivative Actions overall that counsel and the DRC had conducted a thorough and impartial investigation.

Special Matters Committee (SMC)

Shortly after the gas leak occurred, Sempra's Board created the SMC to provide oversight over, and to investigate, the various aspects of the gas leak, which ultimately included oversight over the resulting litigation, including the Derivative Actions and the Securities Action. After considering several firms, the SMC retained Skadden to represent it.

---

information beyond those they already had that they needed to access, and to assess the potential exposure arising from any alleged breaches by the officers or directors of their duties or responsibilities. For example, well safety, oversight by the Companies' officers and directors, and communications to the public were areas that the CPUC was investigating so the DRC reviewed the CPUC proceedings and its findings .

[18] In the appeal of the dismissal of the *Kanter* Consolidated Action, the plaintiffs argued that the Board's response to the Fazio Demand and lawsuit demonstrated that a demand would have been futile. The Court concluded that the Board's refusal of the Fazio Demand did not demonstrate that making a demand would have been futile. Rather, at best, the Court concluded, the Board's refusal, which was based on the DRC's investigation and recommendation, made it more probable that the Board would have also refused a demand by the plaintiffs in the Consolidated Actions. Thus, the DRC work was important for the ultimate dismissal of the *Kanter* Consolidated Action as well.

Skadden's responsibility in representing the SMC was to be informed about all aspects of the gas leak.  As part of their work, they were required to review and analyze materials in the JCCP and monitor the Underlying Actions.  They consulted with the lawyers directly involved in the Underlying Actions, both at Skadden and the other law firms involved in the Actions, reviewed filings, and discussed arguments to be made and the necessary steps in the litigation.

<u>The Experience, Reputation, and Expertise of the Lawyers Performing the Services</u>

All of the law firms involved in the investigation and defense of the Underlying Actions are firms with substantial expertise and experience, and excellent reputations, in representing defendants in shareholder derivative and securities fraud litigation. Each of the firms is listed in Chambers and Partners, which ranks firms and lawyers in various specialties, as among the top securities litigation firms in the country. The lead partners at each of the firms--Jack Dicanio at Skadden, Susan Muck at WilmerHale, Robert Gooding at Morgan Lewis, Matthew Close at O'Melveny, and John Dwyer at Cooley--have been recognized as outstanding securities lawyers in a number of publications including Chambers and Partners, and other publications which rank firms and lawyers as well, such as the *Lawdragon 500 Leading Lawyers in America* annual guide and *Super Lawyers*.[19]

The reputation, experience and expertise of law firms and the particular lawyers in litigation is relevant not only to the nature of the services provided but to the rates charged. In this case, Sempra was paying the law firms' fees and expenses during the course of the case, after careful management and analysis.  Sempra is a large company with substantial litigation of all types and is familiar with the market for lawyers of varying experience and expertise in the Los Angeles Superior Courts and the Central District of California.  The rates charged were based on the law firms' normal rates in the market and thus reflected the market, but were substantially discounted.  In this type of situation, particularly with a client as sophisticated in the selection of counsel and management of litigation as plaintiff Sempra here, the decision to retain the law firms and pay the rates billed was plainly a reasonable one which itself establishes that the rates were reasonable. AEGIS itself approved the rates initially charged by Morgan Lewis which demonstrates that AEGIS itself considered the rates to be reasonable and appropriate.[20]

---

[19] All five of the law firms are on the Chubb panel of preferred securities firms, which Chubb has selected due to their experience and expertise in handling complex securities litigation.

[20] AEGIS has, however, refused to pay Morgan Lewis' rates as they increased over the course of the litigation or the fees of the other firms when they were higher than those of Morgan Lewis.  However, there is no basis for refusing to pay a law firm's rates as they increase over the course of a representation (absent an agreement by the firm not to increase the rates) or to require all firms to be charging the same rates.

However, even if one were to analyze the rates by applying the test of whether the rates paid were the rates of comparable lawyers performing comparable services in the market, the rates charged in the Underlying Actions were reasonable.[21]  As stated above, the rates billed were based on the firm's actual rates in the market (although discounted) and thus reflected the market for lawyers of comparable reputation, experience and expertise. The firms here are among the firms with the foremost reputations for handling shareholder derivative and securities litigation in California and nationwide.  I have reviewed the attorneys' fees, including the rates, in dozens of cases in the Los Angeles Superior Courts and the Central District of California, as well as collections of rates as described above, and the rates charged by counsel in the Underlying Actions are plainly within the market for comparable lawyers providing comparable services in both forums.

The Quality of Opposing Counsel

The experience and expertise of opposing counsel is also relevant to an assessment of the reasonableness of the fees incurred in a case.  Here, opposing counsel were very experienced and had substantial expertise in derivative and securities actions.  For example, Jeff Westerman, who was appointed Lead Counsel in the *Kanter* Consolidated Action, is an extremely experienced securities and derivative action litigator and has been recognized by the Los Angeles *Daily Journal* as one of the top 30 securities litigators in California; Pomerantz LLP, counsel for plaintiff in *Plumley*, has been recognized by Chambers and Partners as one of the top plaintiffs securities law firms, and Jennifer Pafiti of Pomerantz has been recognized by Lawdragon 500 and *Super Lawyers*; and Robert Prongay of Glancy, Prongay & Murray, counsel to plaintiff in <u>*Shupak*</u>, has been recognized by the *Los Angeles Daily Journal* as one of the top plaintiffs' lawyers in California.

The Management of the Litigation

An important aspect of the legal fees and expenses in a matter of this type is how the work was managed.  Careful management of a case is itself an indication of the reasonableness of those fees and expenses.  In fact, in a matter of this magnitude, how carefully the matter has been managed may be the most important indicator of the reasonableness of the fees.

The cases were carefully managed by Sempra's in-house legal team which included extremely experienced litigators and litigation managers.[22]  Sempra's selection of Morgan

---

[21] This test was developed in the types of cases (*e.g.*, contingency cases and "private attorney general" cases) where the clients do not pay the fees, manage the case or review the bills, and often the law firms do not have regular rates they are charging their clients. This is not that type of case.

[22] Kimberly McDonnell, Sempra's Associate General Counsel during the course of the Underlying Actions, was assigned to co-lead the in-house legal team responsible for

Lewis and O'Melveny was based not only on the firms' expertise in the areas of the litigation, but also their existing involvement in the JCCP, which made it most cost-effective to retain them. WilmerHale, Cooley and Skadden were retained after the clients considered a number of firms.

The in-house legal team was extensively involved in overseeing the work done. There were regular conferences between members of the in-house team and the law firms handling the Underlying Actions throughout the course of the matters. The in-house legal team was involved in staffing decisions and how to approach all aspects of the case, from both a strategic and cost standpoint. Detailed work plans were prepared annually by the outside firms which were reviewed and approved by in-house counsel. The work plans estimated the cost of the projected work, and, if it appeared a work plan was going to be exceeded, it was discussed by the in-house team and outside counsel and revised if necessary. If the work plan was exceeded, the billings were not paid absent an explanation that was satisfactory to Sempra. The firms were provided with Sempra's outside counsel billing guidelines, which are designed to keep the process of handling litigation as cost-effective as feasible under the circumstances of the case. Sempra negotiated substantial rate discounts with the law firms.

The in-house legal team received outlines of significant work product and reviewed all work product before it was finalized. Sempra was copied on all substantive correspondence.

Sempra managed the invoices and payment of costs for legal work for itself, SoCalGas and the defendant officers and directors. Invoices from the law firms were uploaded into the Sempra billing system which uses both software and an outside firm to assist in the review and approval of invoices for legal fees and expenses. The time and expense entries were also reviewed by the Legal Operations staff of the legal team for issues such as back-up to the expenses billed and whether hourly rates were correct. It was then reviewed by the in-house attorneys involved in managing the litigation, as well as one or more levels of the Law Department management, depending on the amount of the bill, to determine whether the amount billed was reasonable and appropriate, taking into consideration the amount at stake, the complexity of the matter, and the work required. Adjustments were made to the bills where the in-house legal team considered it necessary, and the bills were paid as adjusted. In short, there was a multi-layer system for reviewing the bills in the litigation.

The law firms also carefully managed the cases from a cost standpoint. They coordinated their efforts and divided up the work (*e.g.,* in preparing responses to the demurrers and motions to dismiss) to control costs. They carefully reviewed the bills and

---

overseeing the legal issues that arose. She was involved in the process of selecting the law firms and managing their work and in reviewing and approving their invoices. Ms. McDonnell had been, among other positions, Chief Litigation Counsel at Sempra, and, prior to joining Sempra, was a litigation partner at Pillsbury Winthrop Shaw Pittman, handling complex litigation of various types ranging from products liability to antitrust litigation.

wrote off fees and expenses. They staffed the cases leanly given the amount of work that was required and used lower-rate personnel for document work where possible. They prepared work plans for Sempra, as discussed above, and provided rate discounts.

The foregoing reflects careful management of the matters by both Sempra and the law firms and is itself a strong indication that the fees and expenses ultimately paid are reasonable.

The Fact That the Plaintiff Was Paying the Fees and Expenses During the Litigation Without Certainty of Reimbursement

Sempra has paid the fees and expenses during the Underlying Actions without any certainty that it would be reimbursed for the amounts it was expending, which itself, under the circumstances here, reflects the reasonableness of those fees and expenses. Because it was itself paying the fees, Sempra had every incentive to carefully manage the work from a cost standpoint. [23] Where a client is sophisticated in managing litigation, has been carefully managing the case and has been paying the fees on an ongoing basis without certainty of reimbursement, its determination that the amounts billed and paid is a very strong indication that those fees and expenses are reasonable since the client is considering the same factors that are normally taken into account by courts in assessing the reasonableness of the fees discussed above—the amount potentially at issue, the complexity of the case, what work is necessary, the level of skill, expertise, and resources necessary for the litigation, the quality of the opposition, etc.

Expenses

The law firms billed various expenses. I have reviewed the categories and they are the normal expenses that law firms bill and appear reasonable in amount given the nature of these cases. There were a number of vendors who billed Sempra directly.

Time and Expenses Not Being Sought

There is certain time (and the resulting fees), as well as expenses, that are not being sought from defendant AEGIS in this action for various reasons, even though they were appropriately billed. These include coverage-related work, including communications with AEGIS and the other D&O insurers excess of the AEGIS Policy about the status of the Underlying Actions. [24] Those adjustments are shown on the Invoices.

---

[23]  AEGIS has paid a portion of the fees and expenses incurred in the Underlying Actions and contends that it has no obligation to pay the balance.

[24] Time entries in the invoices were also redacted for maintenance of privilege purposes. That time is being sought.

In addition, an additional five percent of the unreimbursed fees and expenses have been deducted.  This deduction was made to address any potential errors and inconsistencies in the invoices and any other time that should not been billed, but was not identified by the review of the bills. [25] The foregoing is summarized on Exhibit 1.

Summary

Based on my analysis of the foregoing factors, in my opinion, the fees and expenses billed to and paid by Sempra, as set forth on Exhibit 1 hereto, were reasonable.

Dated:  April 25, 2025

_____

Gary Greenfield

`

---

[25] Regardless of how thorough the bill review system is, there will always be a certain number of entries that should not have been billed that are not caught in the process.