UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SEMPRA,

                    Plaintiff,

        v.

ASSOCIATED ELECTRIC AND GAS
INSURANCE SERVICES LIMITED,

                    Defendant.

CASE NO. 2:23-cv-10544-JLS-SSC

**REDACTED ORDER GRANTING
IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR
COMPLETE OR PARTIAL
SUMMARY JUDGMENT (Doc. 44)**

Before the Court is a Motion for Complete or Partial Summary Judgment filed by Defendant Associated Electric and Gas Insurance Services Limited ("AEGIS"). (Mot., Doc. 44; Mem., 68.) Plaintiff Sempra opposed, and AEGIS responded. (Opp., Doc. 84; Reply, Doc. 71.) Having considered the parties' briefs and held oral argument on July 11, 2025, the Court now GRANTS IN PART and DENIES IN PART AEGIS's Motion for the reasons stated below.

## I. PRELIMINARY MATTERS

This dispute arises out of a "Directors and Officers" policy (the "Policy") issued by AEGIS, a mutual insurance company, to Sempra for the period of October 11, 2015 to October 11, 2016. (Compl., Doc. 1; Defendant's Response to Sempra's Statement of Genuine Disputes of Material Fact ("RSUF") 1, Doc. 71-1; Ex. A to Compl., Policy, Doc. 1-1.) Sempra brings one claim for breach of contract against AEGIS, contending that AEGIS violated the Policy by paying "only a small fraction" of the total "Defense Costs" Sempra incurred in a series of lawsuits described below, "fail[ing] to advance or pay" the Defense Costs within 60 days of receipt of itemized defense invoices, and making "inappropriate deductions to" the Defense Costs. (Compl. ¶¶ 1–3, 28–31.)

AEGIS moves for summary judgment, arguing that Sempra's breach of contract claim fails as a matter of law because Sempra cannot establish that the disputed fees qualify as covered "Defense Costs." (*See* Mot.; Mem.) Alternatively, AEGIS moves for partial summary judgment on the following grounds: (1) that AEGIS is not responsible for reimbursing Sempra for expenses Sempra incurred "in defense of matters other than the shareholder derivative actions and [a] securities action;" (2) that AEGIS is not responsible for reimbursing Sempra for "invoices that do not contain sufficient information;" (3) that "administrative, clerical, or general overhead costs are not compensable" under the Policy; and (4) that "the hourly rates applied by AEGIS to the counsel who represented Sempra's directors and officers in the D&O Actions were appropriate." (Mot. at 2.)

2

Both parties submitted statements of genuine disputes of material fact that, in some instances, dispute only portions of a fact asserted by the other party as uncontroverted. (*See generally* RSUF (collecting AEGIS's and Sempra's statements of uncontroverted facts and responses thereto).)  In addition, both AEGIS and Sempra submitted several evidentiary objections.  (AEGIS Evid. Obj., Doc. 59-4; Sempra Evid. Obj., Doc. 84-2.)  As resolution of these issues will bear on the background and analysis portions of this Order, the Court addresses them first.

As to the statements of fact, the Court relies on only the undisputed portion of each party's Statement of Uncontroverted Facts or on only those portions for which the Court concludes there is no genuine dispute.  Separately, as the RSUF occasionally reflects inconsistent numbering—for example, AEGIS's RSUF 97 is Sempra's RSUF 96—the Court references the leftmost RSUF throughout this Order.  (*See, e.g.*, RSUF at 92.)

As to the evidentiary objections, AEGIS objects to the declaration of J. Warren Rissier and its attached exhibits on the grounds that the evidence is "not relevant." (AEGIS Evid. Obj. ¶¶ 3–4; *see also* Rissier Decl., Doc. 55.)  Upon reviewing the declaration and exhibits, the Court OVERRULES AEGIS's objection.  Rissier was counsel to Sempra and one of its indirect subsidiaries in the lawsuits for which the fees at issue in this dispute were incurred.  (Rissier Decl. ¶¶ 1, 3.)  Rissier's declaration and attached exhibits detail actions taken to resolve these lawsuits and are thus directly relevant to the question of whether the invoices submitted to AEGIS are covered under the Policy.  *See* Fed. R. Evid. 401.  For these reasons, the Court similarly finds that no genuine dispute of material fact exists as to RSUF 153, 213, and 214, which AEGIS challenges for their reliance on the Rissier declaration and its attached exhibits.

AEGIS also objects to the declaration and expert opinion of Sempra's expert Gary Greenfield as not relevant and lacking foundation.  (AEGIS Evid. Obj. ¶¶ 1–2.)  The Court OVERRULES AEGIS's objections.  Greenfield's declaration, opinion, and attached exhibits regard the reasonableness of the hourly rates listed in the invoices submitted by

Sempra to AEGIS for coverage. (Greenfield Decl., Doc. 53; Ex. 2 to Greenfield Decl., Greenfield Report, Doc. 53-2.) The declaration is supported by Greenfield's "personal knowledge of the facts" based on his review of various documents and "interviews with Sempra's inhouse counsel and outside counsel for the defendants[.]" (Greenfield Decl. ¶¶ 1, 7.) The Greenfield materials are relevant to the question of whether the fees incurred were "reasonable" as required for coverage under the Policy. (*See* Policy § VI.(C).)

Finally, AEGIS objects to Exhibits 4 and 5 to Sempra's Request for Judicial Notice ("RJN") on the grounds that the documents—two complaints filed in civil actions—"do not appear to have been produced … in discovery." (AEGIS Evid. Obj. ¶ 6; *see also* Sempra RJN, Doc. 52-4.) Courts may take judicial notice of public records, including court records from another case. *See United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004) (taking judicial notice of court records in another case). Exhibits 4 and 5 to Sempra's Request for Judicial Notice are public records, and AEGIS was provided notice of the complaints via December 2015 letters from Sempra to AEGIS. (*See* Sempra's Response to AEGIS Evid. Obj. 6, Doc. 73; *see also* Mem. at 7.) The Court thus OVERRULES AEGIS's objection and GRANTS Sempra's request for judicial notice as to these documents. For these same reasons, the Court also GRANTS Sempra's request for judicial notice with respect to the civil complaint attached to the RJN as Exhibit 2.

Sempra also submitted evidentiary objections in this case. First, Sempra objects to paragraph 15 of the declaration of R. Stacy Lane as inadmissible hearsay and lacking foundation. (Sempra Evid. Obj. ¶ 1.) Sempra also objects to paragraph 17 of the Lane declaration under the best evidence rule and as lacking foundation and mischaracterizing the evidence. (*Id.* ¶ 2.) The Court OVERRULES these objections. These portions of the Lane declaration describe the number of invoices submitted by Sempra to AEGIS for coverage and estimate fees incurred for the hosting and review of electronic data. (Lane Decl. ¶¶ 15, 17, Doc. 58.) Lane was counsel for AEGIS when the invoices were submitted, and the number of invoices referenced is supported by the correspondence Lane

4

sent to Sempra related to the disputed invoices. (*See* AEGIS's Resp. to Sempra's Evid. Obj. ¶ 7, Doc. 71-2.) Furthermore, Lane's summary of the electronic data invoices is admissible pursuant to Federal Rule of Evidence 1006, as the invoices are voluminous and Sempra has access to its own counsel's invoices. Finally, the statements referenced in paragraph 15 of the Lane declaration fall within the hearsay exception for statements offered against an opposing party made by a representative for that party. *See* Fed. R. Evid. 801(d)(2).

Sempra also objects to RSUF 90 and RSUF 115 on the basis of relevance. (Sempra Evid. Obj. ¶¶ 6, 8.) The Court OVERRULES the objections. RSUF 90 relates to whether counsel for a committee established by Sempra's Board appeared on behalf of a Director or Officer. (RSUF 90.) It is thus relevant to the question of whether counsel for that committee was acting on behalf of a Director or Officer, as required to establish coverage under the Policy. *See* Fed. R. Evid. 401. RSUF 115 relies on the deposition testimony of Sempra's Rule 30(B)(6) witness Neil Cayabyab. Both the Cayabyab deposition testimony and RSUF 115 are relevant to the question of whether certain invoices relating to the hosting of electronic discovery constitute Defense Costs under the Policy.

As to all other objections submitted by the parties, the Court either does not rely on the objected material or overrules such objections as boilerplate. *See Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009) (stating that a court need not scrutinize each objection, particularly "boilerplate recitations of evidentiary principles or blanket objections without analysis[.]").

## II. BACKGROUND

### A. Relevant History

This dispute pertains to invoices for fees and expenses Sempra incurred following a discovery of a natural gas leak at one of its Aliso Canyon storage wells. (RSUF 16; 151.) Sempra informed AEGIS of the gas leak on December 8 and December 15, 2015; AEGIS agreed to treat the letters as "a proper notice of circumstances" which could give rise to a

5

Claim under the Policy.  (RSUF 19; *see also* App'x C, Doc. 45-2 at 15.)  Accordingly, any Claim actually made against the Directors and Officers would be "considered made" at the time of such notice.  (Policy § IX.(D)(3).)  Under the Policy, a Claim includes:

> (1) any written demand (other than a SHAREHOLDER DERIVATIVE DEMAND) against any DIRECTORS or OFFICERS for monetary, non-monetary, injunctive or other relief. . .; [and]

> (2) a civil or arbitration proceeding against any DIRECTORS or OFFICERS for monetary, nonmonetary, injunctive or other relief commenced by service of a complaint or similar pleading[.]

(*Id.* § VI.(B).)  A Securities Claim is a Claim brought in whole or in part by a securities holder of Sempra or brought derivatively on behalf of Sempra.  (*Id.* § VI.(X).) Following the Aliso Canyon gas leak, a Securities Claim—in the form of several derivative lawsuits discussed below—was made against the Directors and Officers.

The Policy provides an aggregate limit of liability of $35,000,000 in coverage, subject to a $5,000,000 retention for each Securities Claim.  (RSUF 4; Policy §§ III.(A), (B), VI.(X); *see also* Policy Items 5, 6.)  The Policy disclaims that AEGIS has any duty to defend but imposes on AEGIS a duty to advance "Defense Costs" "no later than sixty (60) days after receipt . . . of itemized invoices" documenting such costs, to be repaid in the event that it is established that such costs are not covered.  (Policy §§ IX.(A), (3).)  The Policy also obligates AEGIS to pay on behalf of Sempra all Ultimate Net Loss—which includes Defense Costs—for which Sempra has granted indemnification to the Directors and Officers arising from a Claim.  (*Id.* § I.(B), VI.(AA).)  At the heart of this dispute is whether certain invoices are covered "Defense Costs."  "Defense Costs" means, in relevant part:

> (1) all reasonable fees and expenses incurred by or on behalf of the DIRECTORS and OFFICERS in the investigation, negotiation, settlement or defense of any CLAIM . . .

DEFENSE COSTS do not include (i) INVESTIGATIVE
EXPENSE resulting from a SHAREHOLDER DERIVATIVE
DEMAND, or (ii) salaries, wages, benefits and overhead
expenses of the DIRECTORS and OFFICERS or employees of
[Sempra].

(*Id.* § VI.(C).) Sempra does not seek coverage for any invoices as "Investigative Expense," which is defined to include "the reasonable costs, charges, fees and expenses . . . incurred solely in connection with the Investigation and evaluation of a [Shareholder Derivative Demand]." (*Id.* § VI.(Q); *see also* Compl. ¶¶ 28–31.) A Shareholder Derivative Demand is a "written demand by a securities holder of [Sempra] upon the board of directors . . . to initiate an investigation or bring a civil proceeding or other action on behalf of [Sempra] . . . against a [Director or Officer.]" (Policy § VI.(Y).)

To analyze whether the disputed invoices are "Defense Costs," the Court first discusses the relevant lawsuits which constituted a single Securities Claim made against Sempra's Directors and Officers under the Policy. (*See* App'x C, Doc. 45-2 at 15; *see also* RSUF 17, 29, 151.) The Court then discusses two committees formed by Sempra's Board after the gas leak: the Special Matters Committee and Demand Review Committee.

### 1. Derivative Lawsuits

Sempra contends that the fees and costs for which it seeks coverage under the Policy were incurred in the investigation and defense of several lawsuits (the "Derivative Lawsuits") brought against Sempra's Directors and/or Officers between February 11, 2016 and June 7, 2017. [1] (RSUF 154, 201.) These lawsuits include *Favors v. Reed*, *Firemen's v. Reed*, *Kanter v. Reed*, and *Shupak v. Reed* (a state court action), which were consolidated into one lawsuit: the *Consolidated Kanter* Lawsuit. (RSUF 32, 154, 164,

---

[1] *Firemen's v. Reed, et al.*, No. 37-2016-00005842-CU-BTCTL (Cal. Sup. Ct., filed Feb. 11, 2016); *Kanter v. Reed*, No. BC611319 (Cal. Sup. Ct., filed Feb. 23, 2016); *Plumley v. Sempra Energy*, No. 316CV00512BENAGS (S.D. Cal., filed Feb. 29, 2016); *Shupak v. Reed*, No. 2:16-cv-01723 (C.D. Cal., filed on April 19, 2016); *Shupak v. Reed*, No. BC617444 (Cal. Sup. Ct., filed Apr. 19, 2016); *Fischman v. Reed*, No. 16-cv-1006-WQH-NLS (S.D. Cal., filed Apr. 25, 2016); *Fazio v. Reed*, No. 37-2017-00007459-CU-SL-CTL (Cal. Sup. Ct., filed March 1, 2017); and *Favors v. Reed*, No. BC-664302 (Cal. Sup. Ct., filed Jun. 7, 2017).

201; Opp. at 10, n. 2; Rissier Decl. ¶¶ 3 n.1, 6 n.3; *see also* App'x D, Doc. 45-2 at 23, 49;
App'x H, Doc. 45-3 at 4; App'x N, Doc. 45-4 at 70.)  The Derivative Lawsuits also include
*Shupak v. Reed* (a federal action), *Fischman v. Reed*, *Fazio v. Reed*, and the securities class
action *Plumley v. Sempra Energy*.  (RSUF 169, 173, 184, 194; App'x E, Doc. 45-2 at 69;
App'x F, Doc. 45-2 at 95; App'x H, Doc. 45-3 at 39; App'x K, Doc. 45-4 at 4.)
Allegations in the Derivative Lawsuits involved issues related to the history of the Aliso
Canyon storage field, resident relocations after the leak, the Directors' and/or Officers'
breach of fiduciary duties in connection to the leak, and statements made to the Securities
and Exchange Commission, the public, the press, and the California Public Utilities
Commission.  (*See* RSUF 155–162, 165–99, 201–202.)

    *Fazio* is the only Derivative Lawsuit preceded by a shareholder demand letter,
which was sent on April 13, 2016, demanding that Sempra's Board "remedy breaches of
fiduciary duties by certain current and/or former directors and executive officers of
Sempra."  (*Id.* 195; *see also* App'x GG, Doc. 45-5 at 110.)  A second demand letter, the
*Stapleton* Demand, was submitted to Sempra's Board on August 30, 2016, but did not lead
to a derivative lawsuit.  (RSUF 40, 195.)

    The *Consolidated Kanter* Lawsuit, the *Fazio* suit, and other civil lawsuits arising
from the Aliso Canyon leak were part of the Judicial Council Coordination Proceeding No.
JCCP 4861 (the "*Coordinated Leak Cases*").  (Rissier Decl. ¶ 6; Ex. 3 to Rissier Decl.,
Doc. 55-3.)  Some of the civil actions contained allegations against Sempra's Directors and
Officers or potentially identified the Directors and Officers as Doe Defendants.  (RSUF
152–53; *see also* Ex. 2 to Sempra's RJN, Doc. 52-6.)

    All of the Derivative Lawsuits arise out of the same alleged "Wrongful Acts" as
defined in the Policy and are thus a single Claim under the Policy.  (RSUF 29, 49, 57; *see
also* Policy §§ VI.(B), (BB).)  No depositions or written discovery occurred in any of the
Derivative Lawsuits, though two motions for relief from the stay of discovery were filed in
*Kanter*.  (RSUF 109; Exs. 9–11 to Rissier Decl., Docs. 55-9, 55-10, 55-11.)  Documents

were requested and produced to civil plaintiffs (but not the shareholder plaintiffs) in the *Coordinated Leak Cases*. (App'x FF, Doc. 68-7 at 252.) Discovery was also conducted in *Toll Brothers v. Sempra Energy*, an action brought by property developers after the Aliso Canyon leak that named several Directors and Officers as defendants. (RSUF 152; *see also Toll v. Sempra Energy*, No. BC674622 (Sup Ct. Cal., filed Sept. 1, 2017).)[2] Sempra filed demurrers, which the Directors and Officers joined, in *Fazio* and in the *Consolidated Kanter* lawsuit. (RSUF 64, 213; Exs. 4 & 5 to Rissier Decl., Docs. 55-4, 55-5; Rissier Decl. ¶ 15; Ex. B to Griffith Decl., Doc. 44-8 at 9.)

All but two of the Derivative Lawsuits were dismissed with prejudice. (RSUF 70, 94, 134, 203; *see also* Exs. 1 & 7 to Rissier Decl., Docs. 55-1, 55-7; Ex. C to Griffith Decl., Doc. 44-8 at 43.)[3] *Shupak* (the federal action) and *Fischman* were voluntarily dismissed without prejudice on April 18, 2016, and August 4, 2017, respectively. (*Shupak v. Reed*, 16-1723, Doc. 19; Ex. A to Griffith Decl., Doc. 44-8 at 4.)

In dismissing *Fazio*, the state court applied the presumption afforded by the business judgment rule, which "protects a board's good faith decision to reject a derivative lawsuit so long as the majority of the board does not have a personal interest in the lawsuit's outcome." (Ex. 1 to Rissier Decl., *Fazio* Decision at 8, Doc. 55-1 (quoting *Bader v. Anderson*, 179 Cal. App. 4th 775, 788 (2009).) This presumption applies "where the decision [to reject the demand] is made by an independent majority of board members who are not financially or otherwise interested in the challenged transaction, and the board conducted a reasonable investigation of the facts." (*Id.* at 8 (citation and quotation

---

[2] A court may judicially notice court documents that are already in the public record or have been filed in other courts regardless of whether a party seeks judicial notice. *See Reyn's Pasta Bella, LLC v. Visa USA Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *see also* Fed. R. Evid. 201(c)(1) (authorizing courts to act *sua sponte* in taking judicial notice); *Howard*, 381 F.3d at 876 n.1 (taking judicial notice of court records in another case). The Court thus *sua sponte* takes judicial notice of the public records in *Toll* reflecting minutes of informal discovery conferences and motions for discovery. The Court likewise *sua sponte* takes judicial notice of Plaintiff's voluntary dismissal in *Shupak* (the federal action).

[3] RSUF 134 and 203 state that all of the Derivative Lawsuits were dismissed with prejudice; however, as detailed herein, two lawsuits were dismissed without prejudice.

omitted).)  "An exception" to the business judgment rule's presumption "exists in
circumstances which inherently raise an inference of [a] conflict of interest" such as
actions taken "with improper motives, or as a result of a conflict of interest."  (*Id.*
(quotations omitted).)  The presumption "can be rebutted" by allegations of "fraud, bad
faith, overreaching or an unreasonable failure to investigate material facts."  (*Id.*
(quotations omitted).)

The *Fazio* court noted that Sempra's Board "specifically relied on" the
recommendation of the Demand Review Committee (an independent committee discussed
below) in "deciding to refuse [the] [p]laintiff's demand."  (*Id.* at 9, 20.)  The court then
concluded that the plaintiff failed to "offer any affirmative allegations . . . that would
suggest that the [Demand Review Committee's] investigation was carried out in bad faith
or constitute[d] an unreasonable failure to investigate material facts.").  (*Id.* at 9.)
Moreover, the plaintiff failed to allege facts showing that the Demand Review Committee
did not review an "extensive list of evidence" referenced in the Sempra Board's resolution
adopting the recommendation.  (*Id.*)  There was "nothing in the Board Resolution that
would remotely suggest that the [Demand Review Committee's] investigation was
conducted in bad faith or was unreasonably deficient."  (*Id.*)  Thus, the presumption
afforded by the business judgment rule applied, and the case was dismissed.  (*See
generally id.*)

### 2.  Committees Established by Sempra's Board

#### a.  The Special Matters Committee

On February 3, 2016—prior to the filing of the first Derivative Lawsuit—Sempra's
Board of Directors formed the Special Matters Committee ("SMC").  (RSUF 18; *see also*
App'x MM ("SMC Formation"), Doc. 68-8 at 25.) ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

10

██████████████████████████████████████ (RSUF 18; *see also* SMC Formation.)  The SMC Charter established that the SMC's "purpose and responsibilities" were to "serve as an advisor to the Board with respect to special matters[.]"  (App'x OO ("SMC Charter") § I, Doc. 68-8 at 34.)  The SMC Charter further provided that the SMC would "at the request of the Board recommend a course of action to the Board that the [SMC] believe[d] [was] in the best interest of the Company and its shareholders" and obligated the SMC to "independently . . . examine and review, in conjunction with . . . legal counsel . . . the facts and circumstances related to the Special Matters[.]"  (*Id.* § III.3.1.)  The SMC's legal counsel was to "report directly to the [SMC];" communications between the SMC's legal counsel, the SMC, and the Board would be "considered privileged and confidential[.]"  (*Id.* § III.3.2.)  The SMC retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to "serve as independent advisors or counsel to [it]." (RSUF 21.)

The SMC held various meetings from 2016 to 2019.  (*See, e.g. id.* 31, 78.)  In these meetings the SMC discussed several Aliso Canyon issues, including: (1) resident relocations, (2) legislative and regulatory matters, (3) a root cause analysis being conducted to determine the cause of the leak (the "Root Cause Analysis"), (3) print and media coverage, (4) financial and insurance matters, and (5) litigation.  (RSUF 31, 42–43, 47, 53–54, 58, 63, 65, 67, 71, 74, 77–78, 83.)  The details of litigation updates to the SMC are redacted.  (App'xs PP, QQ, RR, SS, UU, WW, XX, YY, ZZ; CCC, DDD, EEE, AAA.)

### b. The Demand Review Committee

On May 11, 2016, Sempra's Board of Directors formed the Demand Review Committee ("DRC").  (RSUF 35, App'x LL ("DRC Charter"), Doc. 68-8 at 20.) ████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

On July 2017, the DRC retained Susan S. Muck, Esq., initially of the law firm Fenwick & West LLP ("Fenwick") and later of Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale") to "assist" the DRC "in investigating the allegations contained in the [shareholder demands] and Derivative Actions."  (RSUF 60, 205; App'x II ("DRC Recommendation"), Doc. 68-8 at 1, 3.)  ████████████████████████████

████████████████████████████████████████████████

████████████████  No attorney at Fenwick or WilmerHale entered an appearance on behalf of any Sempra Director or Officer in any of the Derivative Lawsuits.  (RUSF 90.) However, the DRC filed statements in the *Fazio* lawsuit regarding the status of its investigation.  (Exs. 1–3 to Muck Decl., Docs. 54-1, 54-2, 54-3.)

To satisfy its duties, the DRC reviewed allegations contained in the *Fazio* and *Stapleton* shareholder demands, as well as allegations in the other Derivative Lawsuits. (RSUF 205; DRC Recommendation at 3.)  This investigation included interviews of 24 witnesses, review of the Root Cause Analysis, legal and factual research, the review and analysis of 235 depositions—including those of certain Directors and Officers—and review of more than 3,000,000 documents produced in the Aliso Canyon civil actions. (DRC Recommendation at 4; *see also* RSUF 207, 208.)  The DRC also conducted research as to the claims and potential claims against the Directors and Officers in the Derivative Lawsuits and demand letters, and monitored the Aliso Canyon civil actions.  (RSUF 207; DRC Recommendation.)  At the conclusion of its investigation, the DRC determined that it was "not in Sempra's best interest to pursue any claims [against the Directors and Officers] based on the allegations contained in the Demands and [Derivative Lawsuits]."  (RSUF 209; DRC Recommendation at 5.)  Sempra's Board adopted the DRC's recommendation

on February 22, 2022, formally resolving to reject the shareholder demand letters and seek dismissal of the remaining Derivative Lawsuits.  (RSUF 210; DRC Recommendation.)

### B. The Parties' Coverage Dispute

Sempra filed the instant action on December 15, 2023, challenging AEGIS's denial of coverage as to certain invoices submitted to it by Sempra for coverage.  (*See* Compl.) Sempra submitted invoices totaling $43,025,114 to AEGIS, for which AEGIS paid $7,519.401.  (RSUF 228.)  The following information regarding AEGIS's acknowledgment of the Derivative Lawsuits and payment of invoices submitted to it for coverage under the Policy are relevant to the present dispute.

### 1. AEGIS's Acknowledgment of the Derivative Lawsuits

Between March 24, 2016 and June 28, 2017, counsel for AEGIS acknowledged receipt of the Derivative Lawsuits.  (RSUF 29, 37, 50, 59.)  AEGIS's March 24, 2016 acknowledgement stated that it understood that the Insureds planned to retain Morgan, Lewis & Brockius LLP ("Morgan Lewis") for the *Firemen's*, *Kanter*, *Plumley*, and *Shupak* (federal) actions, and requested that Sempra provide to AEGIS "the name and hourly rate" of each billing attorney on the matters.  (*Id.* 29.)  AEGIS further provided consent to the defense arrangement subject to "(1) defense counsel charging only reasonable and necessary fees and expenses at hourly rates agreed upon by AEGIS; (2) the reservation of rights set forth within th[e] letter; and (3) the Insureds' satisfaction of the applicable $5 million Retention."  (*Id.*)  AEGIS requested that Sempra provide defense invoices "as they [were] generated" and include "copies of defense cost statements, itemized as to the nature of the individual services rendered, the identity of the individual attorney providing the services, the time allocated to the specific service and a description of all disbursements."  (*Id.*)  Finally, the letter stated that AEGIS would not reimburse for any word processing, secretarial, or "similar services that are part of general overhead expenses."  (*Id.*)  AEGIS followed up several times on its request for information about defense counsel representing the Directors and Officers on the noticed actions.  (RSUF 37, 39.)

### 2.  Submission and Payment of Invoices

On February 14, 2017, AEGIS received an email from Morgan Lewis with a link to
a "D&O eRoom" that contained invoices documenting charges incurred through December
2016.  (RSUF 44; *see also* App'x P, Doc. 68-4 at 132.)  The invoices listed charges from
Morgan Lewis, O'Melveny, and Skadden.  (RSUF 44; App'x P.)  The invoices also
included charges from several discovery-hosting companies used by Morgan Lewis to
"maintain databases of all documents collected, reviewed, and produced in the
*Coordinated Leak Cases* that were relevant or potentially relevant to" the Derivative
Lawsuits.  (Rissier Decl. ¶¶ 3, 8; *see also* App'x P.)

On May 23, 2017, counsel for AEGIS acknowledged receipt of the invoices, and
recognized $2,494,622.55 of the $3,931,132.50 submitted for coverage.  (RSUF 55, 73;
App'x P.)  AEGIS deducted each time entry that was redacted, and further reduced certain
charges after applying "the maximum rates charged by [Morgan Lewis]" to all billed
hourly rates.  (App'x P at 132.)  AEGIS applied maximum rates of "(1) $995 for Partners;
(2) $640 for Associates; and (3) $325 for Paralegal/Support."  (*Id.*)  Sempra disputed the
deductions.  (RSUF 62, 69; *see also* Not. of Sub., Doc. 71-3 at 63.)  In response, AEGIS
recognized some additional costs, but further maintained that many of its deductions,
including those for costs it believed were not incurred in defense of a claim, were justified
under the Policy.  (RSUF 66, 73; Ex. E to Lane Decl., Doc. 68-8 at 231; App'x Q, Doc.
68-5 at 1.)

From September 2018 to February 2024, over 1000 additional invoices were
uploaded to the D&O eRoom for coverage.  (RSUF 75, 84, 86, 92, 95, 101, 106, 110;
Mem. at 13; Lane Decl. ¶ 15.)  Invoices pertaining to eDiscovery reflected charges that
were "split 50/50 between D&O and the civil lawsuits."  (RSUF 115; *see also* App'x III,
Cayabyab Dep. 59:8–24, Doc. 68-8 at 179.)  AEGIS acknowledged portions of the
submitted invoices as covered under the Policy, but made deductions for "redacted time
entries, excessive billing rates, fees not incurred in defense of the claim [and] lack of

documentation for expenses and insufficient description." (Mem. at 14; RSUF 76, 85, 88, 93, 98, 102, 107.) Sempra disputed several of AEGIS's deductions. (RSUF 96.) Ultimately, AEGIS paid $7,519,401 for what it believes to be covered Defense Costs under the Policy. (RSUF 228.)

Sempra then filed the instant action seeking additional coverage under the Policy for its submitted invoices. The parties do not dispute that California law governs the Policy. (*See id.* § IX.(Q).)

### III.   LEGAL STANDARD

#### A. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1079–80 (9th Cir. 2004) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(c))). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" when its resolution "'might affect the outcome of the suit under the governing law.'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248).

"Where the party moving for summary judgment would bear the burden of proof at trial, that party 'has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.'" *Bernstein v. Virgin Am., Inc.*, 365 F. Supp. 3d 980, 984 (N.D. Cal. 2019) (quoting *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)). By contrast, when the moving party would not bear the

burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

"If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists." *Bernstein*, 365 F. Supp. 3d at 984 (citing *Nissan Fire*, 210 F.3d at 1102). "If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment." *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The non-moving party does not meet this burden by showing "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Nor is "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position … sufficient." *Anderson*, 477 U.S. at 252. Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. When ruling on a summary judgment motion, the Court must examine all the evidence in the light most favorable to the non-moving party. *Celotex*, 477 U.S. at 325. The Court cannot engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the jury. *Anderson*, 477 U.S. at 255. Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient. *See Schneider v. TRW, Inc*., 938 F.2d 986, 990–91 (9th Cir. 1991).

### B. Insurance Policy Interpretation

Under California law, the interpretation of an insurance contract is a question of law. *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264

16

(1992). A fundamental rule of contract interpretation is that the Court must "give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Waller*, 11 Cal. 4th at 18 (citing Cal. Civ. Code § 1639). "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense . . . controls judicial interpretation." *AIU Ins. Co. v. Superior Ct.*, 51 Cal. 3d 807, 822 (1990) (internal citation omitted); *see also Transamerica Ins. Co. v. Superior Ct.*, 29 Cal. App. 4th 1705, 1714 (1994) ("If a meaning a layperson ascribes to contract language is not ambiguous, courts will apply that meaning.") (citations omitted).

The insured "has the initial burden to demonstrate that the conduct forming the basis for the claim falls within the within the basic scope of the insurance policy." *Foster Farms, LLC v. Everest Nat'l Ins. Co.*, 670 F. Supp. 3d 953, 965 (N.D. Cal. 2023), *appeal dismissed*, 2024 WL 2763663 (9th Cir. Feb. 21, 2024) (citing *Waller*, 11 Cal. 4th at 16)). "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured whereas exclusionary clauses are interpreted narrowly against the insurer." *Dart Indus., Inc. v. Com. Union Ins. Co.*, 28 Cal. 4th 1059, 1071 (2002) (cleaned up, citation and quotation omitted). The insurer must phrase exclusionary clauses in a way that is "*conspicuous, plain and clear*." *Id.* (emphasis in original, citation and quotation omitted). "This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded." *Id.*

## IV. ANALYSIS

Under California law, the elements for a claim for breach of contract are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990). AEGIS's motion contends that, as a matter of law, it is not in breach of its Policy with Sempra. (Mot.) There is no dispute that AEGIS

recognized Sempra's December 8, 2015 and December 15, 2015 letters regarding the Aliso Canyon gas leak as "proper notice of circumstances that could give rise to a potential Claim under the Policy."  (RSUF 19; App'x C.)  The relevant question then is whether the expenses for which Sempra seeks coverage fall within the terms of the Policy.

At summary judgment, AEGIS bears the burden to show that Sempra lacks evidence to establish that the invoices triggered AEGIS's duty to advance and pay Defense Costs.  In other words, AEGIS must establish that Sempra cannot show that its fees were "reasonable" and incurred "by or on behalf of" the Directors and Officers in defense of a Claim.  (*See* Policy § VI.(C).)

Resolving AEGIS's motion requires the Court to first interpret a provision of the Policy relevant to the parties' dispute.  The Court then applies that interpretation to evaluate whether Sempra's invoices are Defense Costs covered under the Policy.

### A.  Policy Interpretation

The Policy defines Defense Costs to include "all reasonable fees and expenses incurred by or on behalf of the [Directors and Officers] in the investigation . . . or defense of any Claim."  (Policy § VI.(C)(1).)  It does not further define "on behalf of."  (*See id.*)  The parties disagree as to the meaning and application of this phrase.  (*See* Mem. at 17–20; Opp. at 15; 20–21, 23; Reply at 7–9, 12–13.)

"A policy term is considered ambiguous when it is capable of two or more constructions, but only if both are reasonable."  *Fire Ins. Exch. v. Superior Ct.*, 116 Cal. App. 4th 446, 455 (2004) (citing *MacKinnon v. Truck Ins. Exch.,* 31 Cal. 4th 635, 648 (2003), *as modified on denial of reh'g* (Sept. 17, 2003)).  "To determine whether both constructions are reasonable, the term must be considered in light of the language of the whole policy, and cannot be found to be ambiguous in the abstract."  *Id.* (citation and quotation omitted); *see also Aydin Corp. v. First State Ins. Co.,* 18 Cal. 4th 1183, 1191 (1998), *as modified on denial of reh'g* (Oct. 14, 1998) (insurance policy provisions, "like the provisions of any other contract, must be construed in the context of the policy as a

whole."). "The fact that a word carries multiple meanings does not by itself render it ambiguous." *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 472 (2004) (citation omitted). Nor is a term rendered ambiguous merely because it is not defined in a policy. *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 868 (1998), *as modified* (Sept. 23, 1998).

"If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect the objectively reasonable expectations of the insured." *Truck Ins. Exch. v. Kaiser Cement & Gypsum Corp.*, 16 Cal. 5th 67, 84 (2024) (cleaned up); *see also E.M.M.I.*, 32 Cal. 4th at 470. Any remaining ambiguity is "resolved in the insureds' favor, consistent with the insureds' reasonable expectations." *E.M.M.I.*, 32 Cal. 4th at 471 (citation and quotation omitted). However, courts should not "strain to create an ambiguity where none exists." *Ray v. Valley Forge Ins. Co.*, 77 Cal. App. 4th 1039, 1044 (1999), *as modified* (Jan. 27, 2000).

Sempra's theory in this case relies on an understanding of "on behalf of" as inclusive of fees and expenses incurred for work that *benefited* the Directors and Officers. (*See* Opp. at 11–12, 15, 20–21.) AEGIS, on the other hand, asserts that such language extends to only fees incurred by counsel "retained to represent the interests of" the Directors and Officers. (Mem. at 18; *see also* Reply at 7.)

The Court interprets on behalf of with reference to the "clear and explicit meaning [of the phrase] interpreted in [its] ordinary and popular sense[.]" *AIU Ins.*, 51 Cal. at 822. Merriam-Webster defines "behalf" as "interest or "benefit"; it defines "on behalf of" as "in the interest of; as a representative of." The Oxford English Dictionary provides a similar definition. The phrase seems to be capable of "two or more constructions" within ordinary and popular usage: it may mean "in the interest of," "as a representative of," or in "benefit" of. *See Fire Ins.*, 116 Cal. App. 4th at 455. Though these meanings often overlap, they will not always do so: one acting in the interest or for the benefit of another may or may

19

not be acting as a representative of the other.  Put simply, one may act incidentally for the benefit of another, without acting with the intent to benefit them.

Though "on behalf of" carries multiple meanings, the phrase is ambiguous only if the meanings are reasonable when considered in light of the language of the Policy.  *See id.*  Here, Sempra's interpretation of the disputed language—that work done "on behalf of" the Directors and Officers means work done on behalf of Sempra and its shareholders, which indirectly resulted in a "benefit" to the Directors and Officers—is not "objectively reasonable."  *See Kaiser Cement*, 16 Cal. 5th at 84.

The Policy, considered as a whole, does not provide coverage for all Defense Costs that Sempra *itself* incurs.  Instead, the Policy is more circumscribed: a "Policy of Directors and Officers Liability Insurance" extending coverage to Defense Costs for which Sempra "has granted indemnification to" the Directors and Officers.  (Policy §§ I.(B); VI.(C).)  This suggests that "on behalf of" places a limitation on Policy coverage.

Moreover, neither common sense nor case law supports an interpretation of "on behalf of" as inclusive of fees incurred for work done for the benefit, or in the interest, of another when that interest is *merely incidental* to the actor's main objective.  *See Smith Kandal Real Est. v. Cont'l Cas. Co.*, 67 Cal. App. 4th 406, 421 (1998) (evaluating "performed on behalf of" in an exclusionary clause as focused "on the identity of the client on whose behalf" work was conducted and further stating that "on behalf of" did not extend to work conferring "some incidental benefit" on a non-client).  The two cases Sempra cites do not undermine this point.  (*See* Opp. at 21.)  First, both consider when expenses are incurred "in defense of" a claim, rather than "on behalf of" a party.  *See Foster-Gardner*, 18 Cal. 4th at 886; *Barratt Am., Inc. v. Transcon. Ins. Co.*, 102 Cal. App. 4th 848, 860 (2002).  Second, the principle underlying these cases is that once such expenses "qualify as defense costs" they then retain that status, even if they serve more than one objective.  *See Barratt*, 102 Cal. App. 4th at 860.  But this does not address the first "critical" part of the test—whether the incurred costs are covered at all.  *Id.*

The Court thus finds "on behalf of" to be unambiguous within the Policy: Fees are incurred "on behalf of" the Directors and Officers if and only if they are generated by one who acts with the intent to benefit the Directors and Officers.

## B.  Coverage

Having determined the unambiguous meaning of "on behalf of" as used in the Policy, the Court must now evaluate whether the Policy covers the following disputed categories of invoices: (1) Special Matters Committee invoices; (2) Demand Review Committee invoices; (3) invoices pertaining to the electronic hosting of documents collected for and produced in discovery; (4) invoices AEGIS contends were incurred for "other work" not in defense of a Claim; (5) invoices AEGIS argues contained insufficient information to establish coverage; (6) invoices pertaining to administrative, clerical, or general overhead costs; and (7) invoices to which AEGIS applied standard hourly rates.

### 1.  Special Matters Committee Invoices

AEGIS contends that Sempra cannot meet its burden to show that invoices from the SMC are covered Defense Costs under the Policy for two main reasons: (1) the SMC was formed before any of the Derivative Lawsuits were filed; and (2) though the SMC investigated and discussed some areas of alleged liability in the Derivative Lawsuits, the evidence does not suggest that the SMC fees were incurred for actions taken by or on behalf of the Directors and Officers.  (Mem. at 17–20; Reply at 7–10; *see also* RSUF 238.) The Court agrees.

There is no dispute that the SMC was formed before any of the Derivative Lawsuits were filed.  (RSUF 18.)  Sempra argues this is irrelevant because the Directors and Officers "had already been potentially identified as DOE defendants in other lawsuits [related to the Aliso Canyon leak] before the SMC's formation."  (Opp. at 21.)  In addition, "AEGIS received notice of the potential claim against the Directors and Officers before the SMC's formation, and the scope of the SMC's investigation broadly covered everything related to the leak, including all litigation."  (*Id.*)  Sempra's produced evidence

substantiates these arguments: the Directors and Officers had been potentially identified as Doe defendants in lawsuits related to the Aliso Canyon leak before the SMC's formation, and on December 8 and December 15, 2015, AEGIS received notices of the Aliso Canyon gas leak.  (*See* RSUF 16, 19, 154; Ex. 4 to Sempra's RJN ¶ 11, Doc. 52-8; Ex. 5 to Sempra's RJN ¶ 38, Doc. 52-9; App'x A; Ex. A to App'x KKK; Policy § IX.(D)(3); SMC Formation.)  AEGIS further agreed to treat the December 8 and December 15, 2015 letters as "a proper notice of circumstances that may give rise to a Claim" under the Policy. (RSUF 19.)  This establishes that the Derivative Lawsuits filed against the Directors and Officers were "considered made at the time such earlier notice [was] given," but is not itself sufficient to show that the SMC invoices are covered Defense Costs.  (Policy § IX.(D)(4).)  Sempra must also establish that such invoices sought to recover "reasonable fees and expenses incurred by or on behalf of" the Directors and Officers.  (*Id.* § VI.(C)(1).)

The evidence Sempra presents to establish coverage shows that the SMC invoices include fees for investigation into matters pertaining to allegations in the Derivative Lawsuits.  (RUSF 238.)  These matters include: (1) the relocation program for residents after the leak was discovered; (2) the Root Cause Analysis; (3) legislative and regulatory matters; (4) media and public hearings regarding the leak; (5) financial and insurance coverage matters; and (6) safety enhancement plans and other operations updates.  (*Id.*; *see also* Mem. at 17; Opp. at 21 (referencing Mem. at 17).)  But coinciding interests between the SMC and Directors and Officers does not itself establish that fees were incurred on behalf of the Directors and Officers.  Rather, the evidence must show that any benefit such fees had for the Directors' and Officers' interests was more than incidental to the objective(s) for which the SMC incurred fees.  Sempra failed to produce any such evidence.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████    The SMC then retained Skadden to "serve as

independent . . . counsel" and "perform such roles and responsibilities" necessary for the

SMC to "fulfill its purposes, duties and responsibilities"—e.g., to fulfill the SMC's general

duty to recommend a course of action it believed to be "in the best interest of the [Sempra]

and its shareholders." (*Id.* § II.2.2; *see also* RSUF 21.)  It is not reasonable to understand

actions done "in the best interest of [Sempra] and its shareholders" as done "on behalf of"

the Directors and Officers.

Second, the evidence does not establish that the SMC's counsel acted in or

considered the interests of the Directors and Officers.  The SMC meeting documents show

redacted paragraphs of brief "litigation" or "legal" updates. (*See, e.g.* App'xs PP, QQ.)

Given the breadth of litigation facing Sempra at the time, that the SMC discussed litigation

matters cannot alone suffice to meet Sempra's burden.  Furthermore, though the SMC

discussed matters pertinent to the Derivative Lawsuits, such as the Root Cause analysis

and relocation program, there is no evidence that interests specific to the Directors and

Officers were ever discussed or considered by the SMC.  It does not follow from the fact

that there were shared interests between the SMC and the Directors and Officers that the

SMC counsel's work was done with the intent to benefit the Directors and Officers.

For these reasons, Sempra fails to show that a genuine issue of material fact exists

as to coverage under the Policy for the SMC invoices, and AEGIS is entitled to summary

judgment on this portion of Sempra's claim.

### 2.  Demand Review Committee Invoices

AEGIS next contends that Sempra cannot establish that the DRC invoices seek to

recover fees and expenses "incurred by or on behalf of" the Directors and Officers.  (Mem.

at 17–20; Policy § VI.(C).)  The Court agrees.

AEGIS asserts that the legal services provided to the DRC "were provided for the specific purpose of assisting *Sempra* in making various determinations" rather than for "the purpose of defending the [Directors and Officers] against the claims asserted against them" in the Derivative Lawsuits. (Mem. at 19 (emphasis in original).) There is no dispute that the DRC retained "independent" counsel to "assist the [DRC] in investigating the allegations contained in [] Demands and [the Derivative Lawsuits]." (RSUF 60; *see also* DRC Recommendation; DRC Charter § II.2.2.) And the DRC's purpose was to "recommend a course of action to the Board" in light of its review, investigation, and evaluation of the "facts and circumstances alleged" in the *Fazio* demand and any subsequent shareholder demands. (DRC Charter §§ I, III.3.1.) Notably, this recommended course of action could have included a recommendation to pursue claims *against* the Directors and Officers. (*See id.* §§ II.2.2., III.3.1.) Given that distinct possibility, and the DRC's general purpose to assist Sempra, the Court cannot conclude that DRC counsel was acting with the intent to benefit the interests of the Directors and Officers. Indeed, had any DRC attorneys acted "on behalf of" the Directors and Officers, it would raise an inference of impropriety as to the entire DRC investigation. Put simply, it is not possible to *both* act on behalf of a group and simultaneously conduct an independent investigation into that group. The two actions are in direct tension. Had DRC counsel acted on behalf of the Directors and Officers, such action would have jeopardized—if not completely nullified—the independence of the DRC's investigation.

The *Fazio* court's application of the business judgment rule highlights this point. (*See Fazio* Decision.) There, the court applied the business judgment rule in concluding that the plaintiff failed to "offer any affirmative allegations . . . that would suggest that the DRC's investigation was carried out in bad faith or constitute[d] an unreasonable failure to investigate material facts." (*Id.* at 9.) And it did so in reliance on Sempra's assertion that "the Board agreed to accept the DRC's recommendation" after determining that the investigation was "reasonable, thorough, and undertaken in good faith[.]" (Ex. 4 to Rissier

Decl. at 16.)  Had DRC counsel been acting with the intent to benefit the interests of the Directors and Officers, such actions would have represented a conflict of interest between the motives of DRC counsel and independence of the DRC investigation.  This could have resulted in the *Fazio* court declining to apply the presumption afforded by the business judgment rule, and/or precluded Sempra from asserting in demurrer that the Board accepted the DRC's investigation upon concluding that the investigation was "undertaken in good faith."  (*See id.*)  Though Sempra points to the *Fazio* decision as proof that the DRC's investigation was helpful to the Directors and Officers, helpfulness is not enough.  At base, DRC counsel acted on behalf of an independent committee established to provide a recommendation that would be in the best interest of Sempra and its shareholders, not the Directors and Officers.  (*See generally* DRC Charter.)  Had DRC counsel acted in or considered the interests of the Directors and Officers, such acts would have violated its ethical duty and likely jeopardized—rather than assisted—the Directors' and Officers' interests in the Derivative Lawsuits.

Finally, Sempra's citations to *Hansen Natural Corporation. v. St. Paul Mercury Insurance Co.*, 2009 WL 8602914 (C.D. Cal. June 3, 2009) (tentative decision), and *MBIA Inc. v. Federal Insurance Co.*, 652 F.3d 152, 163 (2d Cir. 2011), do not persuade the Court that the DRC invoices are covered Defense Costs under the Policy.  (*See* Opp. at 17–19.)  As AEGIS argues in reply, the policies in those cases "obligated the insurers to reimburse or advance defense costs incurred by both the insured companies and their directors and officers."  (Reply at 7); *see also Hansen Nat. Corp. v. St. Paul Mercury Ins. Co.*, 2009 WL 10648823, at *4 (C.D. Cal. Mar. 26, 2009) (citing policy provision requiring insurer to pay for loss which the company was legally obligated to pay due to any securities claim); *MBIA*, 652 F.3d at 162, n.4.  Here, by contrast, the Policy provides coverage as to fees incurred "by or on behalf of" the Directors and Officers, not Sempra.  (Policy § VI.(C)(1).)  For these reasons, *Hansen* and *MBIA* do not support a finding that coverage under the Policy extends to the DRC invoices.

Accordingly, AEGIS is entitled to summary judgment on Sempra's claim for coverage of the DRC invoices under the Policy.

### 3. Insufficient Information – eData Invoices

AEGIS argues that Sempra cannot meet its burden to demonstrate that redacted invoices pertaining to the hosting and review of electronic data collected and stored in connection with discovery (the "eData Invoices") constitute covered Defense Costs. (Mem. at 23–24; Reply at 12–13.) Here, too, the Court agrees.

Sempra's first argument for coverage of the eData Invoices is that counsel for the Directors and Officers "reviewed and relied on the documents and data [collected and stored in connection with discovery that occurred in other civil actions] in their investigation and defense of the [Derivative] lawsuits." (Opp. at 23.) With this, Sempra appears to recognize that use of documents associated with the eData Invoices by counsel for the Directors and Officers is key to establishing coverage under the Policy. But Sempra provides no citation to the record in support of this assertion. (*See id.*) Nor has the Court found any record evidence of counsel to the Directors and Officers stating that they reviewed and relied on documents and data associated with the eData Invoices in the course of defending the Directors and Officers. Rather, Sempra provides only the declarations of Susan Muck, who served as independent counsel to the DRC, and J. Warren Rissier, who "represented Sempra and SoCal Gas" in the Derivative Lawsuits. (Muck Decl., Doc. 54; Rissier Decl. ¶ 3.) Muck attests that "the DRC and its counsel monitored the various Aliso Canyon gas leak-related court and regulatory proceedings [and] reviewed court filings and attended proceedings[;]" this review included analysis of "data collected and produced in the JCCP Action." (Muck Decl. ¶¶ 13–14.) Similarly, Rissier attests that he and other unidentified defense counsel, "reviewed and analyzed many documents contained in th[e] [eData] databases." (Rissier Decl. ¶ 8.) Sempra's objections and responses to AEGIS's first set of interrogatories likewise make repeat reference to the fact that the documents associated with the eData Invoices were "made

26

available to the Demand Review Committee's outside counsel[.]" (Doc. 68-7 at 252; *see also id.* at 254–55, 261–65, 267–70.) Sempra's opposition similarly goes on to contend that the documents "were made available to the DRC's counsel." (Opp. at 23.) But, for the reasons discussed above in Section III.B.2, the DRC counsel's review of such documents is insufficient to bring the eData Invoices within the coverage provisions of the Policy. The key question is whether counsel for the Directors and Officers reviewed and relied upon such documents—to this point, Sempra has provided merely a one-sentence answer, unsupported by any record evidence.

Sempra next argues for coverage on the grounds that it could have "submitted all the e-discovery invoices to AEGIS under the Policy[.]" (Opp. at 23.) This is because the eData Invoices pertain in part to discovery conducted in connection with at least some civil actions in the *Coordinated Leak Cases* and *Toll* that "sought (or potentially sought) damages from the Insureds." (*Id.*; *see also* RSUF 152; Thayer Decl. ¶ 20, Doc. 56.) Sempra also argues that coverage is warranted because plaintiffs in the *Kanter* Derivative Lawsuit sought relief from the stay of discovery. (Opp. at 23.) Neither argument creates a genuine dispute of material fact as to whether the eData Invoices are covered.

At the hearing on this motion, Sempra's Counsel stated that it decided at the start of the Aliso Canyon litigation to split discovery-related costs between the Policy at issue here and a separate policy issued to it by AEGIS not at issue in the instant dispute. This accords with the deposition testimony of Neil Cayabyab: "charges related to the eDiscovery were split [] 50/50 between D&O and civil lawsuits." (RSUF 115; App'x III 44:22–24.) AEGIS's Counsel stated at the hearing that AEGIS accepted coverage for invoices related to discovery hosting in the *Coordinated Leak Cases* and *Toll* under the separate policy issued to it by Sempra.

Sempra's decision to split costs for eData hosting between the two policies is its own to bear. No discovery occurred in any of the Derivative Lawsuits (RSUF 109), and the proper policy for coverage of eData hosting charges in the *Coordinated Leak Cases*

27

and *Toll* is the policy under which coverage has already been provided.  Furthermore, motions for relief from the stay of discovery in *Kanter* cannot suffice to bring the entirety of the eData Invoices within the Policy's coverage.  (RSUF 109; *see also* Exs. 9–11 to Rissier Decl.)  As discussed above, to the extent the documents collected and hosted in the civil actions were relevant to *Kanter* or the defense of any other Derivative Lawsuit, Sempra has failed to provide evidence from which the Court can parse such relevance.  An unsupported, generalized argument for full coverage of the eData invoices does not suffice.

For these reasons, AEGIS is entitled to summary judgment on Sempra's claim for coverage of the eData Invoices.

### 4.  "Other Work" Invoices

AEGIS's Motion challenges, in one paragraph, Sempra's ability to recover fees pertaining to "other work" on the grounds that the invoices are not for work performed "in defense of the Claim."  (Mem. at 20.)  AEGIS identifies four categories of invoiced time entries for "other work": (1) entries relating to the performance of work for the SMC and/or DRC by the Directors' and Officers' counsel; (2) entries for work conducted in connection with responding to various governmental investigations; (3) entries relating to "regulatory and other corporate work for Sempra"; and (4) entries "relating to insurance coverage issues."  (*Id.*)  AEGIS then identifies thirteen billing entries it excluded from coverage within those categories.  (*Id.* at 20–22.)

Reviewing these entries, the Court finds that several cannot be covered Defense Costs under the Policy.  For instance, coordinating the production of documents in response to requests external to the Derivative Lawsuits cannot constitute work that incurred reasonable fees in defense of the Derivative Lawsuits.  (*See, e.g.*, *id.* (listing time entries for production of documents to the California Public Utilities Commission).)  But reviewing 10-K and other SEC filings at issue in the Derivative Lawsuits, on the other hand, could warrant coverage.  (*See id.*; *see also* RSUF 167, 172 (Derivative Lawsuits made allegations regarding SEC filings).)  As even this cursory analysis shows, the Court

cannot fully evaluate AEGIS's motion without individual review of each time entry to which AEGIS applied "not related to defense of claim"; "corporate work"; "public relations"; or "insurance-related" deductions.  Accordingly, and as discussed below, the Court finds that appointment of a special master is warranted to provide a Report and Recommendation regarding whether Sempra has produced sufficient evidence to recover fees for the deducted "other work" time entries.

### 5. Insufficient Information – Redacted/Vague Entries

AEGIS contends that Sempra cannot establish that invoices with insufficient information due to redactions and/or vague time entries are covered Defense Costs.  (Mem. at 22–24.)

The Court agrees with AEGIS that fully redacted time entries or those such as "research re [redacted]" and "Analyze case law re: [redacted]" are insufficient to create a genuine issue of material fact as to whether such fees were reasonable and incurred by or on behalf of the Directors and Officers in defense of the Derivative Lawsuits.  Such entries provide next-to-no information.  And Sempra has submitted no additional evidence, such as declarations from timekeepers, to establish that these redacted time entries relate to the Derivative Lawsuits.  While Sempra argues that it cannot be forced to submit unredacted invoices containing privileged communications or attorney work product for coverage (Opp. at 22), it provides no further justification for its privilege claims, nor has it filed any invoices under seal for this Court's review.  Accordingly, AEGIS is entitled to summary judgment on at least those invoices which are entirely redacted or for which Sempra has provided insufficient information to raise a genuine issue of material fact as to their coverage.  However, over 1,000 invoices are at issue in this dispute, and AEGIS's argument highlights only "a few" examples for the Court.  (*See* Mem. at 22–23.)  As with the "other work" deductions, the Court intends to appoint a special master to provide a Report and Recommendation regarding this portion of AEGIS's Motion.

### 6. Administrative and Overhead Invoices

AEGIS also seeks summary judgment on invoices pertaining to administrative, clerical, or general overhead costs, contending that Sempra "was aware since the inception of the Claim" that such costs were not reimbursable. (Mem. at 24–26.) The Court is not persuaded.

The Policy does not exclude administrative, clerical, or "general overhead" costs. (*See generally* Policy.) By contrast, it does exclude from Defense Costs "salaries, wages, benefits and overhead expenses of the [Directors and Officers] or employees of [Sempra]." (*Id*. § VI.(C).) A court cannot read into a policy that which an insurer has omitted. *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 764 (2001). Furthermore, that the Policy excludes *some* forms of overhead expenses, while remaining silent as to others, indicates that AEGIS could and would have explicitly excluded such costs if they were to fall outside the Policy's coverage. *See Dart Indus.*, 28 Cal. 4th at 1071 (exclusionary clauses must be "*conspicuous, plain and clear*") (emphasis in original); *see also Pardee Const. Co. v. Ins. Co. of the W.*, 77 Cal. App. 4th 1340, 1359 (2000), *as modified on denial of reh'g* (Feb. 23, 2000) ("[F]ailure to use available language expressly excluding [] coverage implies a manifested intent not to do so.").

AEGIS fails to show that Sempra cannot meet its burden to establish that fees incurred for administrative, clerical, and general overhead work are covered. Thus, AEGIS is not entitled to summary judgment on this portion of Sempra's claim.

### 7. Hourly Rates

AEGIS contends that Sempra "cannot meet its burden to demonstrate that the rates of Skadden, O'Melveny, and Cooley were reasonable and necessary." (Mem. at 26.) The Court disagrees.

In support of rates ranging from $1,010–1,425 for partners, $515–$920 for associates, and $365 for paralegals (RSUF 45–46, 103), Sempra submits the expert opinion of Gary Greenfield, founder of Litigation Cost Management and a former law firm partner.

30

(Greenfield Decl; Greenfield Report.)  Greenfield has previously testified regarding legal and expert fees in litigation and was appointed a special master to analyze and report to the San Francisco Superior Court regarding fees and expenses of various law firms in a separate insurance company proceeding.  (Greenfield Report at 3.)  Greenfield attests that "the hourly rates charged by defense counsel were reasonable."  (Greenfield Decl. ¶ 8.) Greenfield's determination is based on application of Rule 1.5 of the American Bar Association's ("ABA") Model Rules of Professional Conduct, which sets out several factors for consideration in assessing the reasonableness of fees.[4]  (Greenfield Report at 7.) Greenfield's opinion is further based on the fact that all firms involved have "substantial experience and expertise in representing defendants in shareholder derivative and securities litigation" and the lead partners at each firm "have been recognized as outstanding securities lawyers[.]"  (Greenfield Decl. ¶ 8; *see also* Greenfield Report at 17.) The "rates charged were based on the law firms' normal rates in the market[,] but were substantially discounted."  (Greenfield Report at 17.)

Greenfield's testimony is sufficient to create a genuine issue of material fact as to the reasonableness of the hourly rates charged.  AEGIS is thus not entitled to summary judgment on this portion of Sempra's claim.

## V.    NOTICE OF INTENT TO APPOINT SPECIAL MASTER

At the hearing on this motion, the Court raised the possibility of appointing a special master to address certain portions of AEGIS's motion that cannot be effectively and timely resolved by the undersigned or a magistrate judge.  In response, AEGIS's Counsel stated that it had contemplated suggesting the appointment of a special master to

---

[4] Those factors are: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent."  (ABA Model Rules, Rule 1.5.)

resolve certain arguments raised in its motion.  Sempra's Counsel provided no indication as to whether it would consent to or oppose the appointment of a special master.

The Court now finds that appointment of a special master is warranted and appropriate to provide a Report and Recommendation regarding AEGIS's motion for summary judgment as to (1) invoices for fees incurred for "other work" by counsel for the Directors and Officers; and (2) invoices with insufficient information, other than those related to eData.  (*See* Mem. at 20–24.)  Resolving whether AEGIS is entitled to summary judgment on these portions of Sempra's claim would require the Court to review voluminous time entries, thereby expending significant judicial resources and creating a strain on the Court.  Given that the Central District of California is one of the most congested judicial districts in the country, neither the undersigned nor a magistrate judge of this district will have the ability to resolve this portion of AEGIS's Motion in a timely and effective manner.  *See* Table C-3—U.S. District Courts–Civil Federal Judicial Caseload Statistics (March 31, 2025), https://www.uscourts.gov/data-news/data-tables/2025/03/31/federal-judicial-caseload-statistics/c-3 (last visited July 27, 2025).

## VI.  CONCLUSION

For the above reasons, AEGIS's Motion for summary adjudication is GRANTED as to Sempra's invoices pertaining to fees incurred for (1) the Special Matters Committee; (2) the Demand Review Committee; and (3) eDiscovery hosting.  The Motion is also GRANTED with respect to any invoices that are entirely redacted.  The Motion is DEFERRED as to invoices deducted on the grounds that the fees were incurred for "other work" not in defense of a Claim, and invoices—other than eData Invoices—for which AEGIS deducted costs due to "insufficient information."  The Motion is DENIED in all other respects.

The Court further provides notice of its intent to appoint a special master.  Within **fourteen (14) days**, the parties are ORDERED to jointly file a submission providing (1) their consent or objections to the appointment of a special master; (2) their proposals for a

special master; (3) their proposals as to the specific description of the scope of work of the special master; and (4) a proposed fee allocation.  The filing may not exceed **six (6)** pages.

In addition, the parties are ORDERED to review and, where relevant, identify and submit proposed redactions as to any information within this Order that they believe requires sealing.  Any applications to seal must be submitted in accordance with the Local Rules within **fourteen (14) days** of this Order.  If no applications are submitted within this timeframe, the Order will be unsealed and filed on the public docket.

DATED:  August 13, 2025

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE